PIERCE, Justice, for the Court:
¶ 1. Leslie “Bo” Galloway was convicted and sentenced to death by lethal injection by a jury of his peers after the jury determined he committed the murder of Sha-keylia Anderson while he was (1) engaged in sexual battery; (2) a person under sentence of imprisonment at the time; (3) a felon previously convicted of an offense involving the use or threat of violence to another person; and (4) that the murder was especially heinous, atrocious, or cruel.
FACTS AND PROCEDURAL HISTORY
¶ 2. On the evening of Friday, December 5, 2008, seventeen-year-old Shakeylia Anderson and her cousin Dixie Brimage were at their grandmother’s house in Gulf-port, Mississippi, talking and doing each other’s hair. Their uncle, Alan Graham, stopped by briefly. When Graham entered the house, he heard a phone ringing in the living room. He looked at the phone and saw the incoming call was from “Bo.” Graham walked through the house and found Anderson and Brimage hanging out in a bedroom. Graham mentioned that someone’s phone was ringing, and Anderson said it was hers. Graham overheard Anderson on the phone and got the impression that she was getting ready to go out and meet someone.
¶ 3. At approximately 10:00 that evening, Anderson walked out of her grandmother’s house. She was wearing a jacket, blue jeans, and brown boots and carried her book bag with her. Brimage watched Anderson through her grandmother’s glass front door as Anderson walked toward a white Ford Taurus parked in the driveway. Brimage saw Anderson stand by the car for a moment and talk to a man. After about five minutes, Anderson got in the white Ford Taurus with the man, and the vehicle drove away.
¶ 4. The following evening, Martin Smith was hunting with dogs in a secluded, wooded area located west of Highway 15 in northern Harrison County. Smith was searching for one of his dogs that had strayed from the pack when he came across an unclothed dead body lying on a dirt logging road. Smith then called law-enforcement personnel.
¶ 5. Shortly before midnight that same evening, Investigator Michelle Carbine of the Harrison County Sheriffs Department received a call that a body had been found in a wooded area. Carbine arrived at the scene in the early morning hours of December 7, 2008. It was too dark to begin processing the body, so Carbine decided to secure the crime scene and wait until daylight. Carbine returned to the scene around 6:30 a.m. that morning with evidence technician Nancy Kurowski and *626 medical examiner Dr. Paul McGarry. They found the naked body of a black female lying in the middle of a logging path. Carbine said that the deceased female had a red tint to her body, missing hair, and blood underneath the facial area. The body was smeared with blood and dirt, partially burned, and mangled with scrapes, gouges, and lacerations. The body bore at least three tire marks.
¶ 6. Near the scene of the body, investigators found a burned patch of grass and drag marks indicating that something or someone had been dragged from this area to the spot where the body lay. As they walked back toward the body, officials found broken glass from a bottle of New Amsterdam gin and a burned piece of cloth. Pieces of glass were recovered. Numerous tire tracks were near and in a turning pattern around the female’s body. Photographs and impressions of the tracks were made and measurements were taken. Based on the condition of the body and the crime scene, Dr. McGarry theorized that the female had been run over by a vehicle, most likely a car.
¶ 7. After some investigation, Carbine determined that the deceased female was Anderson. Based on Brimage’s description of the man with whom Anderson had left that Friday evening, and Graham’s recollection of “Bo” calling Anderson’s phone, as well as information from friends and family, Carbine began looking for a light-skinned black male, approximately five feet, five inches tall, from the Moss Point area, nicknamed “Bo,” who drove a white Ford Taurus.
¶ 8. On the evening of December 9, 2008, Lieutenant Ken McClenic of the Jackson County Sheriffs Department received information that Harrison County was looking for a black man with the nickname “Bo” who drove a white Ford Taurus. Through his investigation, McClenic identified Leslie Galloway as a possible suspect. Having obtained a residential address for Galloway, McClenic drove by and observed a white Ford Taurus in the driveway. McClenic and other deputies began conducting surveillance of the residence. Later that same evening, the white Ford Taurus was reported leaving the residence. Officers stopped the vehicle a short distance away. Galloway and Cornelius Triplett, a friend of Galloway’s, were inside the vehicle. Galloway was placed under arrest.
¶ 9. Carbine responded to the scene. Carbine walked around the Taurus and noticed a small piece of possible evidence flapping underneath the passenger side. Since the vehicle was going to be towed and Carbine feared the substance might be lost, she collected the item. Officers also noticed some broken glass on the lip of the trunk. The vehicle was then towed and secured at Bob’s Garage. A search warrant for the car was obtained and executed by Kurowski and two other investigators. When the vehicle was raised on a lift, officers noted that one side of the undercarriage appeared to be wiped cleaner than the other. Pursuant to a second search warrant, the car was turned over to the Harrison County Sheriffs Department and taken to a work center for processing.
¶ 10. Kurowski processed the car. For comparison to the tire impressions taken from the crime scene, Kurowski made tread impressions of the white Ford Taurus. The tire tracks at the crime scene matched the type of tire on the white Ford Taurus Galloway was driving when he was arrested. From the interior of the car, Kurowski collected blood located just above the trunk-release latch and blood from the left rear passenger door near the door handle. From different places underneath the car, Kurowski collected several pieces of a stringy tissue-like substance. *627 Both the blood and the tissue substances were matched to Anderson’s DNA.
¶ 11. A search warrant was obtained and executed for Galloway’s residence. There, officers seized a pair of Nike shoes, an Atlanta Braves baseball hat, a Burger King shirt with the name tag “Bo,” and an empty bottle of New Amsterdam gin. DNA testing revealed the presence of Anderson’s DNA on the shoes and on the baseball hat.
¶ 12. During the autopsy, Dr. McGarry collected additional physical and biological evidence from Anderson’s body, including swabs of her anal and vaginal cavities. Analysis of the vaginal swab indicated the presence of DNA from Anderson, Galloway, and James Futch. Futch was Anderson’s boyfriend, who admitted that he had sexual intercourse with her days prior to her disappearance and death. As part of his examination, Dr. McGarry noted that Anderson had a dilated vagina— indicative of sexual activity — and her anus had stretching injuries including abrasions, rubbing of the lining, and a fresh tear— three quarters of an inch by one quarter of an inch — characteristic of forceful anal penetration. Dr. McGarry concluded that the anal tear had been caused by forceful sexual penetration. He reasoned that the tear could not have been caused by being run over or crushed by the automobile, because Anderson’s rectum was intact — or had not been penetrated by any broken bones — but was naturally in a protected area of the body. Dr. McGarry also explained that the tear was not caused by some foreign object, such as a metal or wooden instrument, because the rubbing and stretching injuries to the rectum were not consistent with jamming, ripping, or irregular injuries that would be associated with penetration by that type of object. The injury to her anus involved much more subtle characteristics.
¶ 13. Days after his arrest, on December 10, 2008, Galloway spoke with Carbine. Galloway admitted that he went by the nickname “Bo.” Galloway stated that he had been seeing Anderson since November 2008, and he said that he had sex with Anderson on Thanksgiving Day. Galloway admitted that he spoke with Anderson on December 5 and picked her up that evening in a white Ford Taurus.
¶ 14. Also, as part of the criminal investigation, Carbine obtained cell-phone records for Galloway from November 1, 2008, to December 21, 2008. The records indicated that Galloway and Anderson had been in contact beginning as early as November 11, 2008, and every day in December leading up to her disappearance and murder. They were in contact as many as fourteen times on Friday, December 5, 2008, the last time being 11:12 p.m.
¶ 15. Galloway was indicted and tried for the capital murder of Anderson. A jury found him guilty of capital murder based upon sexual assault. During the penalty phase, the jury heard testimony from Galloway’s friends and family members, who testified that he was a good father and that they would visit him if he was given life imprisonment. The jury also heard testimony from corrections officers explaining that Galloway had not caused any trouble during his prior incarceration. The State introduced a “pen pack” which included Galloway’s prior conviction for carjacking and demonstrated that Galloway was under supervision of the Mississippi Department of Corrections (MDOC) when he murdered Anderson. Unpersuaded by Galloway’s mitigating proof and finding four aggravating factors, the jury returned a sentence of death.
¶ 16. Galloway now appeals, asserting thirty assignments of error. Additional facts, as necessary, will be related during our discussion of the issues.
*628 1. The trial court committed plain and reversible error by permitting the State to present Dr. Paul McGarry’s “junk science” testimony in support of its allegation of anal sexual battery.
2. The court committed reversible error by failing to respond in a reasonable manner to a jury note regarding a critical issue in the case, resulting in a genuine probability that Galloway was convicted for “conduct that is not crime.”
3. The trial court committed reversible error by allowing the admission of DNA test results without providing Galloway the opportunity to confront the DNA analyst who did the testing.
4. Trial counsel was ineffective for failing to object to critical aspects of Dr. McGarry’s testimony.
5. The trial court reversibly erred by allowing the State to admit Galloway’s incomplete first statement but granting the State’s motion to suppress his second statement, which would have literally completed the story.
6. The court violated Galloway’s rights by excluding penalty-phase evidence that would have rebutted the implication raised by the State’s evidence that he was a future danger.
7. The exclusion of penalty-phase testimony about prison conditions violated Galloway’s due-process rights and prevented him from presenting relevant mitigating evidence.
8. The prosecution engaged in misconduct that requires reversal.
9. Galloway was severely prejudiced by the State’s injection into the trial of nonconfronted hearsay statements.
10. The trial court committed reversible error by overruling the defense’s objection to speculative and constitutionally unreliable testimony on an important issue.
11. Unwarranted delay in scheduling the trial in this case violated Galloway’s constitutional right to a speedy trial.
12. The trial court erred by denying the defendant’s proposed sentencing instructions.
13. The court erred in sustaining the State’s objections to defense counsel’s closing arguments at the sentencing phase.
14. The trial court committed plain and reversible error by requiring the defense tó disclose pretrial “the general nature of the defense.”
15. The trial court erred by overruling defense counsel’s objection to Bonnie Dubourg’s expert qualifications and in allowing her unreliable testimony.
16. The trial court committed reversible error by allowing the admission of DNA statistical probabilities generated by the FBI software program and its CODIS database without providing Mr. Galloway the opportunity to confront the person who created the program and database.
17. Dixie Brimage’s highly suggestive and unreliable in-court identification of Galloway violated his constitutional rights and mandates reversal.
18. The court’s failure to respond adequately to the jury note regarding the critical issue in the case resulted in a reasonable probabil *629 ity that at least some jurors convicted Galloway for having consensual, vaginal sex with Ms. Anderson — “conduct that is not crime.”
19. The evidence was insufficient to sustain the predicate felony of sexual battery and thus insufficient to sustain Galloway’s capital murder conviction.
20. The court erred in ruling inadmissible evidence of the victim’s prior sexual behavior, including letters found in her school locker.
21. The trial court committed reversible error by denying the defendant’s motion to suppress evidence.
22. The trial court violated Galloway’s rights in allowing victim-impact evidence in the guilt-innocence phase over defense objection.
23. Galloway was denied the effective assistance of counsel.
24. The evidence introduced by the State in support of the aggravating circumstance of a prior conviction for a crime of violence was constitutionally insufficient.
25. The especially heinous, atrocious, or cruel aggravating circumstance was constitutionally invalid.
26. By requiring prospective jurors to swear prior to voir dire that they would render “true verdicts ... according to the law and evidence” and commit that they will “follow the law,” the trial court created a constitutionally intolerable risk that Galloway was unable to vindicate his constitutional right to determine whether the prospective jurors in his case could be fair and impartial and follow the law.
27. The trial court erred by limiting nonelector jurors to “resident freeholders for more than one year.”
28. Mississippi’s capital punishment scheme is unconstitutional on its face and as applied.
29. Prosecutor’s unfettered, stan-dardless, and unreviewable discretion violate[d] equal protection, due process, and the Eighth Amendment.
30. This Court should reverse due to the cumulative harm of the errors.
DISCUSSION
1. The trial court committed plain and reversible error by permitting the State to present Dr. Paul McGarry’s “junk science” testimony in support of its allegation of anal sexual battery.
¶ 17. Galloway contends that Dr. McGarry improperly and without any scientific basis told the jury that Anderson’s anal injury must have been caused by penile sexual penetration, to the exclusion of all other causes, and that the penetration was resisted, to the exclusion of consensual sex. Galloway further contends that Dr. McGarry was permitted to testify that the tear was evidence of an “anal rape.” Gall-loway claims that the certainty Dr. McGar-ry conveyed to the jury was fictional and constituted nothing more than junk science. He submits that, at most, Dr. McGarry properly could have testified only that the injury was consistent with noncon-sensual, anal penetration.
¶ 18. At the outset, we note that Dr. McGarry testified without objection *630 from the defense. Further, the defense did not challenge Dr. McGarry’s qualifications, nor did it conduct voir dire prior to his testimony.[1] Thus, Galloway must show that Dr. McGarry’s testimony constituted plain error. “Plain error exists where such error affects the defendant’s substantive/fundamental rights, even though no objection was made at trial.” Parker v. State, 30 So.3d 1222, 1227 (Miss.2010). “To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.” Cox v. State, 793 So.2d 591, 597 (Miss.2001).
¶ 19. According to Dr. McGarry’s findings:
[T]he victim’s anus had stretching type of injuries. The rectal opening, the anus, had the kind of injuries that occur with forceful penetration, with stretching, abrasion or rubbing of the lining of the anus and a tear, so that the anus had been stretched to a point where the tissue ripped up inside the anus canal.
The anus has a ring of muscle around it which normally is closed. When it’s forced open by penetration, the lining is rubbed away, and she had that rubbing injury around her anus. And then up inside where the full stretching had occurred there was a tear, a fresh tear.
¶ 20. The injury, he stated, would have “caused enough pain that it would be resisted. It would not be ... something that a person would want to have done to them. It would be painful enough to want to stop ... or prevent it.” In Dr. McGarry’s opinion, the anal tear was caused by
foreeful penetration of the anus that caused injury to the — what is called the sphincter or the muscle ring around the anus that ordinarily is less than a fourth of an inch in diameter, stretched out to more than an inch in diameter by the penetration of the anal canal. It’s evidence of anal rape.
¶ 21. Dr. McGarry was asked if it was plausible the anal tear was caused by being crushed beneath the vehicle. He stated that “the roll over injury doesn’t affect the anus” because the anus and anal canal are “away from the injuries [caused by] the vehicle. This is in a very protected part of her body between her buttocks, below her pelvis and behind her vagina.”
¶ 22. On cross-examination, Dr. McGar-ry was asked if there was any possibility that bones fractured into the anal area. Dr. McGarry explained that the anal canal is protected by
the front of the bladder, then there is the back of the bladder, then there’s the vagina, then there is the anus behind that, [the pelvic bones] didn’t go through to the anus. It would have had to go through the pelvic organs plus it’s higher than that. It’s above the anus. It’s not part of that injury.
¶ 23. Defense counsel then asked Dr. McGarry why the tear could not have been caused by a branch or some other object. Dr McGarry replied:
[The anal canal] is in a very protected area. You can see by the photographs that this would be out of the reach of something coming into that area. It doesn’t have the appearance of a foreign object being jammed into the anus caus *631 ing that kind of injury. This is a different kind of injury than a dilating injury, a penetrating injury causes a more subtle type of injury. An object like a branch or part of a car coming toward her body, it’s not likely to hit in that area. But even if it did, it would not make this kind of injury. It, [a foreign object], causes a tearing, ripping, irregular, not a dilating, distending stretching injury, but a jamming, tearing injury. This was not what she had.
Dr. McGarry reiterated that, in his opinion, the anal tear could have been caused only by sexual penetration.
¶ 24. The defense presented its own forensic expert, Dr. Leroy Riddick. Dr. Riddick testified that the three-quarter-inch-by-one-quarter-inch tear “could be produced by the stretching of the buttocks” as a result of being run over by a car or from having “strained at the stool or having large very difficult bowel movements.” Dr. Riddick noted that no semen or DNA was found in the anus.
¶ 25. On rebuttal, Dr. McGarry refuted Dr. Riddick’s theory. Dr. McGarry stated:
The injuries that were present in her inner legs and over the area of her vagina and anus were in no way produced by spreading of the legs. Her injuries were those of a rolling type of crush injury where her legs stayed together, her arms got broken, but her legs did not get broken. The area of her anus and her vagina remained in a very protected area. It did not get injured by being dragged or pulled along a road surface. There was no evidence of that around the edges [of the anus], I would not expect for those to be absent if the injuries of her anus were due to direct damage to the area.
The reason this is important is to distinguish between injuries coming in a random fashion from injuries to the body versus forceful sexual penetration. This is so important in distinguishing these two that there are photographs and there are demonstrations that we use in teaching our trainees to make that distinction. They are quite different.
These were injuries of the rim of the anus, just the ring of skin and the muscle around the anus, and then a stretching type of injury that causes the anus to become stretched to a point where it actually tore in one place directly in back, midline in back. And it was inside the anus. There were no injuries around the area or over the vagina that indicated that that part of her body was exposed to the outside or to any rough surfaces. These are classic patterns of penetration, forceful, resisted into anus.
¶ 26. Dr. McGarry was asked to describe the difference between injuries associated with a insertion of a foreign object versus those caused by forceful penile penetration.
Foreign object has whatever shape it has. It digs into the afea and would cause a totally different type of injury, tears and rips the skin and abrades the outside. It goes in at an angle and an unusual configuration. The injuries that are produced by forceful penetration with a penis dilate the anus. It gets bigger and bigger and bigger with more penetration. The edges of the anal opening are rubbed away with repeated penetration, and finally it gets distended and stretched enough that it tears in one place. It tears because that is the place that tears when the entire anus is stretched. It characteristically tears in the midline in back. And this is exactly what she had. She had the injury of forceful penetration by a penis of a sexual event, not a random injury of the area between her legs.
*632 ¶27. The admission of expert testimony is within the discretion of the trial court. In Mississippi, expert testimony is admissible if it is “relevant and reliable.” Ross v. State, 954 So.2d 968, 996 (Miss.2007). Expert testimony is relevant if it will “assist the trier of fact in understanding or determining a fact at issue.” Id. Expert testimony is reliable if it is “based on methods and procedures of science,” not “unsupported speculation.” Id. Unless this Court concludes that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand. Id. at 995.
¶ 28. Mississippi operates under a modified Daubert[2] standard that provides that expert testimony should be admitted pursuant to Rule 702 of the Mississippi Rules of Evidence if it meets a two-pronged inquiry. Anderson v. State, 62 So.3d 927, 936-37 (Miss.2011) (citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 35 (Miss.2003)). “First, the witness must be qualified by virtue of his or her knowledge, skill, experience or education. Second, the witness’s scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue.” McLemore, 863 So.2d at 35 (internal citations omitted). “The Daubert analysis is a flexible one” that varies from case to case. Id. at 38.
¶ 29. “[I]n Mississippi, a forensic pathologist may testify as to what produced [a victim’s] injuries ... and what trauma such an injury would produce.” McGowen v. State, 859 So.2d 320, 335 (Miss.2003) (quoting Holland v. State, 705 So.2d 307, 341 (Miss.1997) (Holland II)). A forensic pathologist may also testify about “wounds, suffering, and the means of infliction of injury,” since it falls within his or her area of expertise. Holland, 705 So.2d at 341. Furthermore, a forensic pathologist may testify as to whether a particular instrument or weapon in evidence was consistent with particular injuries to a victim. McGowen, 859 So.2d at 336.
¶ 30. Dr. McGarry provided similar testimony in the Holland case. In Holland v. State, 587 So.2d 848, 874-75 (Miss.1991) (Holland I), this Court affirmed Gerald Holland’s conviction for capital murder but reversed his death sentence and remanded for a new sentencing hearing because the jury prematurely had deliberated the sentence. As related by the Holland I Court, Dr. McGarry provided the following testimony with regard to his autopsy findings:
The first injuries were of the face, over the sides of the face, over the center of the face, the lips, over the nose, the eyes, they were more swollen, they were the most advanced. About the same time frame, next in line, the injuries of the arms, forearms, wrists, knees, shins. In that same time pattern, the injuries to the genital region, the stretching and scraping and tearing of the vagina and rectal tissues.... These are produced by forceful penetration of the vagina and rectum by a structure that is able to .distend and stretch and tear in a symmetrical pattern. In other words, a round — a roughly round structure penetrating and stretching the vagina and stretching the anus and rectum.... In order to produce these injuries all the [sic] around the edge, it has to be something not as firm and unyielding as a metal or wooden instrument. It has to be a part of a human body or something with that same texture consistency[— like a] male sex organ.

Id.

¶ 31. In Holland II, Holland appealed the death sentence delivered by a resen- *633 tencing jury, and he argued, inter alia, that the trial court had erred in denying his motion to enjoin Dr. McGarry’s testimony, which he contended was rank speculation. Id. at 341. We held that this argument was barred procedurally because Holland had failed to raise this objection to Dr. McGarry’s testimony during the guilt phase. Id. We found, however, that, in spite of the procedural bar, Holland’s assignment of error was meritless, as the State “had demonstrated that Dr. McGar-ry’s testimony fell within the bounds of forensic pathology by demonstrating that his expertise dealt with wounds, suffering, and the means of infliction of injury.” Id.
¶ 32. In Harrison v. State, 635 So.2d 894, 898-99 (Miss.1994), Dr. McGarry was permitted to testify to a number of possible causes of death, and he was allowed to opine that the victim was raped. Dr. McGarry’s expert opinion was the only evidence of rape the State had against the defendant. Id. at 899. Reversible error in Harrison occurred because the trial court denied all defense-counsel attempts to invoke the Box procedures,[3] to consult with or interview Dr. McGarry to ascertain what opinions he might offer, or to make a proffer of proof. Id. at 899-900. This Court also held that due process and fundamental fairness required the trial court to allow the defense access to an independent pathologist because “no amount of lay testimony could have possibly refuted the ‘objective’ opinion of the State’s expert.” Id. at 902.
¶ 33. Here, unlike in Harrison, Galloway was allowed his own expert to rebut Dr. McGarry’s testimony and opinion. The experts’ testimonies and opinions presented factual questions for the jury to determine. We cannot say Dr. McGarry’s opinion that the anal tear was evidence of “anal rape” went beyond his scope of expertise or improperly invaded the province of the jury. For these reasons, we find no reversible error in this issue.
2. The trial court committed reversible. error by failing to respond in a reasonable manner to a jury note regarding a critical issue in the case, resulting in a genuine probability that Galloway was convicted of “conduct that is not a crime.”
¶34. During deliberations, the jury sent out a note which asked, “does murder escalate the sex automatically to sexual battery?” Afterwards, there was some debate in the judge’s chambers about the meaning of the jury’s question. Defense counsel proposed answering the question, “no, it doesn’t.” The prosecution, however, expressed concern over placing too much emphasis on one instruction. The trial court ultimately responded to the jury’s note in writing, “you have all of the instructions of law that apply to this case. Please review those instructions and continue your deliberations.”
¶ 35. Galloway claims this was a deficient response that created a “reasonable probability the jury misapplied the elements of sexual battery.” He contends jury instructions S-2A, S-3, S-4A were “imprecise and ambiguous.” He argues that instruction S-2A might have confused the jury and caused the jurors to consider the “without consent” language contained therein as an element of murder instead as a modifying element of sexual penetration. We disagree.
*634 ¶ 36. The jury is presumed to have followed the trial court’s instructions. Grayson v. State, 879 So.2d 1008, 1020 (Miss.2004). Rule 3.10 of the Uniform Rules of Circuit and County Court Practice states:
If the jury, after they retire for deliberation, desires to be informed of any point of law, the court shall instruct the jury to reduce its questions to writing and the court in its discretion, after affording the parties an opportunity to state their objections or assent, may then grant additional written instructions in response to the jury’s request.
When reviewing a trial court’s response to the jury’s inquiry, this Court’s inquiry is not whether the trial court was “right or wrong” in its response, but whether the trial court abused its discretion. Hooten v. State, 492 So.2d 948, 950 (Miss.1986). Unless the trial court based his decision on an erroneous view of the law, this Court is not authorized to reverse for an abuse of discretion absent a finding the trial court’s decision was “arbitrary and clearly erroneous.” Id.
¶ 37. In Girton v. State, this Court spoke to this type of situation and provided the following:
One of the most nettlesome problems faced by a circuit judge is an inquiry from the jury when it has retired to reach its verdict. The ensuing colloquy between the judge and jury, or instruction resulting therefrom, or both, have been one of the grounds of many appeals to this Court.
We really cannot lay down hard and fast legal principles to govern the myriad circumstances in which a problem may arise.
The patient and attentive judge has heard the evidence, following which he has diligently endeavored to instruct the jury on every possible relevant aspect of the case to guide this body in its deliberations. Having done so, and while he, the parties, and their counsel await the verdict, the judge is called upon to answer some question a juror has about the case.
What is he to do? In deference we offer some common sense suggestions.
Our first recommendation is that the circuit judge determine whether it is necessary to give any further instruction. Unless it is necessary to give another instruction for clarity or to cover an omission, it is necessary that no further instruction be given.
Of course, a circuit judge may realize such a necessity even in the absence of an inquiry from the jury, and under such circumstances quite properly may give the jury additional written instructions. See Wages v. State, 210 Miss. 187, 49 So.2d 246 (1950).
The second recommendation requires the trial judge to constantly bear in mind that justice in every trial requires communication and understanding. Unless words are clearly understood, there is only a communication of sound, or worse, a distinct possibility of the receiver of the information placing a different meaning on what is spoken or written than the author meant. This is critical in any communication from the circuit judge to the jury, or between the judge and jury.
Therefore, a judge should make absolutely certain he understands precisely what is meant in any inquiry from the jury. Unless he is quite certain precisely what the jury means in its inquiry, how can the judge know he is responding properly?
[T]he circuit judge may have understood precisely what Juror Goodnight meant. While this Court believes we have some understanding of what was *635 troubling this juror, we must at the same time concede we are not sure.
If the juror was indeed resolving an inquiry on a certain principle of law as appears from this record, and as the circuit judge apparently understood it, the principle of law had already been thoroughly covered in the two previous instructions.
Girton v. State, 446 So.2d 570, 572-73 (1984).
¶ 38. Here, rather than give a supplemental instruction, the trial court referred the jury to the instructions already provided. Jury Instruction S-2A instructed as to the elements of capital murder based on sexual battery as follows:
The Court instructs the jury that the defendant, LESLIE GALLOWAY, III, has been charged by an indictment with the crime of Capital Murder. If you find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that:
1. On or about December 6, 2008, in the First Judicial District of Harrison County, Mississippi,
2. The defendant, LESLIE GALLOWAY, III, did willfully, unlawfully and feloniously and with or without design to effect death,
3. Kill and murder Shakeylia Anderson, a human being, without authority of law,
4. While in the commission of the crime and felony of Sexual Battery, as defined by Section 97-3-95, Miss. Code of 1972, as amended, in that:
5. The said, LESLIE GALLOWAY, III, did willfully, purposely, unlawfully and feloniously engage in the act of sexual penetration,
6. Without the consent of said Sha-keylia Anderson,
then you shall find the defendant, LESLIE GALLOWAY, HI, guilty of Capital Murder.
If the State has failed to prove any one or more of these essential elements beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence then you shall find the defendant, not guilty of Capital Murder.
Jury Instruction S-3 reads:
The Court instructs the Jury that in order to sustain the crime of Sexual Battery some penetration must be proven beyond a reasonable doubt, however, it need not be full penetration. Even the slightest penetration is sufficient to prove the crime of Sexual Battery.
And Jury Instruction S-4 states:
The Court instructs the Jury that “sexual penetration” is any penetration of the anal opening of another person’s body by any object or part of a person’s body.
¶ 39. We do not find any of the foregoing instructions imprecise or ambiguous. The instructions, together, fully and accurately informed the jury of state law, and the trial court did not err in directing the jury to review these instructions. This issue is without merit.
3. The trial court committed reversible error by allowing the admission of DNA test results without providing Galloway the opportunity to confront the DNA analyst who did the testing.
¶ 40. At trial, Galloway moved to exclude the testimony of Bonnie Dubourg, a forensic DNA analyst for the Jefferson Parish (Louisiana) Sheriffs Department, whose lab conducted DNA testing on the blood and tissue samples obtained by the case investigators. Galloway objected on *636 the basis that Julie Golden, a DNA analyst at the same lab, conducted the DNA testing procedures, not Dubourg. In denying the motion, the trial court stated,
It’s the eourt[’]s understanding that a lab technician who does the testing does not have to testify in person, if the person who analyzed the tests is present and testifies. Miss Dubourg did testify that she analyzed the test results, and additionally she also testified that her superior also reviewed the test results and approved them. So I think under Mississippi law the actual lab technician who does the test is not required to come to court to testify. So the motion will be denied.
¶ 41. We find no error in the trial court’s decision.
¶ 42. The Sixth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution guarantee a defendant in any criminal prosecution the right to confront and cross-examine the witnesses against him or her. U.S. Const, amend. VI (applicable to the states through U.S. Const, amend. XIV); Miss. Const, art. 3, § 26 (1890). The United States Supreme Court has held that, under the Sixth Amendment Confrontation Clause, testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine the witness. Crawford v. Wash., 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). “Forensic laboratory reports created specifically to serve as evidence against the accused at trial are among the ‘core class of testimonial statements’ governed by the Confrontation Clause.” Grim v. State, 102 So.3d 1073, 1078 (Miss.2012) (quoting Melendez-Diaz v. Mass., 557 U.S. 305, 310, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009)).
¶ 43. This Court recently addressed a similar issue in Grim v. State, 102 So.3d 1073 (Miss.2012), a certiorari case where we affirmed the Mississippi Court of Appeals’ finding that a laboratory technician who actually performed the drug analysis need not testify as long as someone with adequate involvement with the testing process testifies. In Grim, the defendant, Frederick Grim, was convicted of selling cocaine. At Grim’s trial, the State introduced into evidence a crime lab report that determined the substance Grim had sold was cocaine. Grim, 102 So.3d at 1077. The lab report was admitted through the testimony of Eric Frazure, a laboratory supervisor, who neither observed nor participated in the testing of the substance, but had reviewed the report for accuracy. Id. Frazure testified that he had performed “procedural checks” by reviewing all of the data submitted by the primary analyst to ensure that the data supported the conclusions contained in the report. Id. at 1081. Frazure had reached his own conclusion that the substance tested was cocaine, and he signed the report as the case “technical reviewer.” Id.
¶ 44. In analyzing the issue, Grim reiterated that “when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness’s testimony does not violate a defendant’s Sixth Amendment rights.” Id. at 1079 (quoting McGowen, 859 So.2d at 339). Grim explained that, in determining whether such a witness satisfies the defendant’s right to confrontation, we apply a two-part test:
First, we ask whether the witness has “intimate knowledge” of the particular report, even if the witness was not the primary analyst or did not perform the analysis firsthand. McGowen, 859 So.2d *637 at 340. Second, we ask whether the witness was “actively involved in the production” of the report at issue. Id. We require a witness to be knowledgeable about both the underlying analysis and the report itself to satisfy the protections of the Confrontation Clause.
Grim, at 102 So.3d at 1079 (quoting Conners v. State, 92 So.3d 676 (Miss.2012) (Carlson, P.J., specially concurring, joined by Waller, C.J., Dickinson, P.J., Randolph, Lamar, Kitchens, Chandler, and Pierce, JJ.)).
¶ 45. Galloway argues, however, that in this instance, Dubourg merely provided surrogate testimony of the kind found unacceptable for purposes of the Confrontation Clause by the United States Supreme Court in Bullcoming v. N.M., — U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). We disagree.
¶ 46. In Bullcoming, the Supreme Court addressed whether “the Confrontation Clause permit[s] the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an.analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification.” Id. at 2710. There, the evidence introduced was “a forensic laboratory report certifying that [Donald] Bullcoming’s blood-alcohol concentration was well above the threshold for aggravated DWI.” Id. at 2709. The laboratory analyst (Razatos) who testified about the report “was familiar with the laboratory’s testing procedures, but had neither participated in nor observed the test on Bullcoming’s blood sample.” Id. The Supreme Court held that, when the prosecution elected to introduce the blood-alcohol analyst’s (Caylor’s) certification, that analyst became a witness Bulleoming had a right to confront. Id. at 2716. The Court reasoned: “surrogate testimony of the kind Razatos was equipped to give could not convey what Caylor knew or observed about the events his certification concerned, i.'e., the particular test and testing process he employed. Nor could such testimony expose any lapses or lies on the certifying analyst’s part.” Id. at 2715.
¶ 47. Galloway contends that, as in Bullcoming, Dubourg was not a sufficient surrogate for Golden. He argues that, because the State did not produce Golden, defense counsel could not question her about her critical tasks of initial presumptive testing, DNA extraction (including the differential extraction of the DNA on a vaginal swab), DNA quantitation, polymerase chain reaction (PCR), the separation and detection of PCR-produced STR (short tandem repeat) alleles and the production of electropherograms through electrophoresis. Galloway also contends that only Golden could have been examined concerning possible contamination of the samples and her vigilance in attempting to prevent it.
¶ 48. Galloway’s contentions are without merit. Distinguishable from Bullcom-ing, the record here illustrates that Du-bourg,' as the technical reviewer assigned to the ease, was familiar with each step of the complex testing process conducted by Golden, and Dubourg performed her own analysis of the data. Cf. id. at 2722 (Soto-mayor, J., concurring) (specifying that an inadmissible report in the case had not been admitted through “a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue”). Dubourg personally analyzed the data generated by each test conducted by Golden and signed the report. Given Dubourg’s knowledge about the underlying testing process and the report itself, any questions regarding the accura *638 cy of the report due to possible contamination of the DNA samples could have been asked of Dubourg.[4] See, e.g., Williams v. Illinois, — U.S. -, 182 S.Ct. 2221, 2244, 183 L.Ed.2d 89 (2012) (plurality opinion) (“knowledge that defects in a DNA profile may often be detected from the profile itself’).
¶ 49. Consistent with our holding in Grim, we find that no Confrontation Clause violation occurred in this case. This issue is without merit.
4. Trial counsel was ineffective for failing to object to critical aspects of Dr. McGarry’s testimony.
¶ 50. Galloway claims his trial counsel was constitutionally ineffective for failing to object to Dr. McGarry’s highly prejudicial testimony (1) that the anal tear must have been caused by a human penis; (2) that the tear would have required such force as to be resisted; and (3) that stated a legal conclusion beyond his specialized knowledge.
¶ 51. In evaluating an ineffective-assistance charge, this Court applies the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674, 693-95 (1984), and adqpted by this Court in Stringer v. State, 454 So.2d 468, 476-77 (Miss.1984). Galloway must show: (1) that his counsel’s performance was deficient, and (2) that this alleged deficiency prejudiced his defense. Lindsay v. State, 720 So.2d 182, 184 (Miss.1998), (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). The burden of proving both prongs lies with Galloway, who is faced with a rebuttable presumption that trial counsel is competent and his performance was not deficient. Chase v. State, 699 So.2d 521, 526 (Miss.1997). Additionally, Galloway must show that there is a reasonable probability that, but for the errors of his counsel, the judgment would have been different. Fisher v. State, 532 So.2d 992, 997 (Miss.1988). Finally, this Court must determine whether trial counsel’s performance was both deficient and prejudicial to the defense based upon the “totality of the circumstances.” Carr v. State, 873 So.2d 991, 1003 (Miss.2004) (citing Carney v. State, 525 So.2d 776, 780 (Miss.1988)). If this Court finds that an ineffective-assistance charge chiefly fails under the prejudicial prong, then we may proceed directly to this part of the test. See Strickland, 466 U.S. at 697, 104 S.Ct. 2052 (“If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.”).
¶ 52. We note that ineffective-assistance-of-counsel claims ordinarily are more appropriately brought during post-conviction proceedings, as this Court on direct appeal is limited to the trial-court record in its review of the claim. Wilcher v. State, 863 So.2d 776, 825 (Miss.2003). If we find that the record before us contains insufficient information to address the claim, the appropriate procedure is to deny relief, preserving the defendant’s right to argue the issue through a petition for post-conviction relief. Read v. State, 430 So.2d 832, 837 (Miss.1983). This Court, however, may address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record. M.R.A.P. 22.
*639 ¶ 53. Here, we proceed directly to the prejudice prong. Having already concluded that no reversible error was present in Dr. McGarry’s testimony, we find that Galloway’s ineffective-assistance-of-counsel claim with regard to Dr. McGarry’s testimony fails. Accordingly, this issue is without merit.
5. The trial court reversibly erred by allowing the State to admit Galloway’s incomplete first statement but granting the State’s motion to suppress his second statement, which would have literally completed the story.
¶ 54. After his arrest, Galloway gave investigators two statements. The first statement was given on December 10, 2008. The second statement was given eight days later, on December 18. In his first statement, Galloway said he previously had had sex with Anderson and that he had picked her up in his mother’s car on December 5, 2008. Thereafter, he invoked his right to counsel and the interrogation ended. In his second statement, which Galloway initiated, Galloway stated that he and Anderson had gone to a park on the night of the murder, where they had consensual sex. At the park, they were overpowered by two men with a gun, who raped and killed Anderson by setting her afire and running her over with the car.
¶ 55. The State introduced the first statement at trial during Carbine’s testimony. The State, however, filed a pretrial motion to exclude the second statement on the basis that it was self-serving. Galloway contends that the trial court granted the motion and committed reversible error by excluding the second statement.
¶ 56. The record does not clearly indicate that to be the case. It shows the following pretrial exchange, in pertinent parts, regarding these two statements:
PROSECUTOR: Yes, sir, your Honor. The basic motion is to exclude a self-serving statement. There are actually two statements obtained in this case, one was on ... December 10, 2008 and [another was given December 18, 2008]. We’re moving to exclude the statement and any reference to the statement made on [December 18], because it’s self-serving.
THE COURT: You don’t intend to use any portion of the statement?
PROSECUTOR: We do not at this time, your Honor. And again, I’m specifically referring to the December 18 [statement.]
THE COURT: The 18th statement.
PROSECUTOR: Yes, sir. And as a part of our motion we would ask that any reference to that statement, not just the statement alone, but whether it be the defendant’s demeanor or any reference to the defendant’s statement, we would ask that it be excluded.
THE COURT: All right. Mr. Rishel or Mr. Stewart, any response?
DEFENSE: Judge, if I could just respond briefly on that matter. You ruled on this matter when we tried to suppress it back-I’m not sure, but it was several months ago. Now Mr. Huffman is talking about two different statements here, and in my understanding based on their motion that they want to exclude the second statement, which is made on December the 18th.
THE COURT: Which one did I suppress?
DEFENSE: You didn’t suppress either one of them. We moved to suppress them, judge. You ruled against us with reference to that.
*640 THE COURT: And now the [S]tate is moving to basically suppress one of them.
DEFENSE: Yes, sir. And that’s the trouble I have right now. We’re not objecting to that right now, [Jjudge, but I still have concerns about the first statement if they’re trying to — if the [Sjtate is going to try to put in the first statement, I guess that’s the [Sjtate’s—
PROSECUTOR: Uh-huh.
DEFENSE: Unless they open the door for some reason, [Jjudge.
THE COURT: I understand. If they open the door you can certainly use it.
DEFENSE: Certainly. Judge, I know we had the same motion recently, and I anticipate what your ruling is going to be and we have no objection to it at this point.
THE COURT: All right. The motion will be granted. I will see /all in the morning at nine.
PROSECUTOR: And, your Honor, if I can briefly, ... I know it’s long, but as part of your ruling that would include any reference to that statement whether it be did you make a statement, did you speak to law enforcement.
THE COURT: No reference to the December 18 statement.
¶ 57. Based on this Court’s reading of the trial court’s ruling, Galloway was not expressly prohibited from introducing the December 18 statement. Rather, the trial court prohibited Galloway from referring to the second statement unless the State opened the door by introducing the first statement. When the State did introduce the first statement, Galloway made no attempt to introduce the second statement. Accordingly, this issue is without merit.
6. The court violated Galloway’s rights by excluding penalty-phase evidence that would have rebutted the implication raised by the State’s evidence that he was a future danger.
¶ 58. Relying on Skipper v. South Carolina, 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1, 7 (1986), Galloway argues that the State implicitly impressed upon the jurors’ minds that he was a future danger; therefore, he had the due-process right to introduce evidence (via Dr. Beverly Smallwood) regarding how he might behave in the future. The implications contended by Galloway, for the first time on appeal, that unfairly conveyed to the jury that he posed a future danger are: evidence that he previously had been convicted of carjacking and was under post-release supervision at the time of the crime; Dr. McGarry’s comment on direct examination that the massive surface burn sustained by Anderson “would be a million times worse than touching a hot flame”; the four statutory aggravating factors alleged by the State; the fact that the State questioned Deputy Catchings about whether she had seen Galloway “outside of the jail”; and the State’s commending Bri-mage for “bravel/’ identifying Galloway, which suggested that she had reason to fear Galloway.
¶ 59. The State responds that it made no express or implied attempt at trial to place Gallowa/s future propensity for dangerousness in issue. The State contends that Galloway attempts to demonstrate the State’s purported implication(s) by pointing to inconsequential snippets of the trial, in which the defense made no contemporaneous objection.
¶ 60. We agree with the State. Gallo-wa/s contentions on this assignment of error are simply after-the-fact assertions, barred from consideration on appeal be *641 cause they were not properly raised and preserved in the trial court. Hemmingway v. State, 483 So.2d 1335, 1337 (Miss.1986). The issue of whether Galloway posed a future danger, however, was a matter at trial, and we will address it accordingly.
¶ 61. Prior to trial, the State filed a motion in limine seeking to prohibit Galloway from introducing evidence concerning his “ability to adapt to prison life in the future and his propensity (or lack thereof) to commit violent acts in the future.” The State’s motion contended that such evidence “is inadmissible because it is purely speculative and irrelevant to the charges in this case ... [and] is not being offered through the testimony of a qualified, accepted expert in the field of predicting future behavior.”
¶ 62. Prior to the sentencing phase, the trial court heard arguments from both sides (none of which involved the “implications” complained of above) concerning the State’s motion. The defense argued that Galloway had the right to present mitigating evidence to the jury showing that, if Galloway were spared the death penalty and sentenced to life in prison without parole, his life would be a suffering existence and not that of someone sitting in an air-conditioned room watching ESPN all day. The record indicates that Galloway sought to illustrate the true conditions of prison life through the testimony of Donald Cabana, former superintendent of the Mississippi State Prison at Parchman. The record also shows that the defense had hoped to have Dr. Smallwood, a psychologist, testify as a mitigating witness. But, as Galloway’s defense told the trial court, Dr. Smallwood was unavailable to testify; thus, the defense did not intend to call her as a witness-contrary to Galloway’s contention on appeal.
¶ 63. Ultimately, the trial court made the following ruling: “I’m not going to prevent [Galloway] from putting on any kind of testimony about his behavior while incarcerated in the past,” but the defense witnesses, “will be prohibited from speculating as to how he might behave in the future.”
¶ 64. We find no error in the trial court’s ruling. This Court has rejected similar arguments in Witcher v. State, 697 So.2d 1123 (Miss.1997), and Hansen v. State, 592 So.2d 114, 147 (Miss.1991), and we do so again today;
¶ 65. In Hansen, Tracy Hansen argued that the trial court erred in refusing to allow opinion testimony of a prison counselor that he would adapt well to prison life in the future. Hansen, 592 So.2d at 147. The counselor had become acquainted with Hansen while Hansen was incarcerated in the Florida correctional system. Id. Hansen relied on Skipper, 476 U.S. at 5, 106 S.Ct. 1669, wherein the United States Supreme Court wrote:
[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.
Hansen, 592 So.2d at 147. Thq. Hansen Court noted this Court’s long acceptance of this rule, and stated:
All of this is but an elaboration upon the familiar lesson of Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989-990 (1978): “the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from, considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” The Constitution demands individualized sentencing and prohibits a court from excluding any *642 relevant mitigating evidence as a matter of law. Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1, 10-11 (1982).
Hansen, 592 So.2d at 147 (emphasis added). Hansen held, however, that speculative opinion testimony of how a defendant may adapt to prison life in the future is not admissible unless the expert is qualified and accepted in the field of predicting future behavior. Id. Because Hansen had failed to show the counselor was qualified as such an expert, we affirmed the trial court’s decision not to allow the counselor to opine how Hansen would adapt to prison life in the future. See id. (noting the trial court did allow the counselor “substantial liberties in testifying about Hansen’s past”).
¶ 66. In Wilcher, Bobby Wilcher argued that the trial court erred in excluding both Cabana’s testimony and photographs of Parchman to demonstrate the harshness of a life sentence. Wilcher, 697 So.2d at 1133. The Wilcher Court, held that the trial court properly excluded this evidence because “[t]he harshness of a life sentence in Parchman in no way relate[d] to Wil-cher’s character, his record, or the circumstances of the crime.” Id. (citing Hansen, 592 So.2d at 147; Minnick v. State, 551 So.2d 77, 96 (Miss.1989), reversed on other grounds by Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Cole v. State, 525 So.2d 365, 371 (Miss.1987); Lockett v. State, 517 So.2d 1317, 1334 (Miss.1987)).
¶ 67. Here, no proffer was made to the trial court as to what Cabana’s testimony would entail, and no evidence was presented that he is an expert in the field of predicting future behavior. We can surmise, though, based on the defense’s argument to the trial court, that the defense intended Cabana to testify about generalities of prison life. Consistent with our holding in Wilcher, the trial court properly excluded such testimony because it was irrelevant to Galloway’s character, his record, or the circumstances of his crime. As the State points out, the trial court permitted the testimony of two corrections officers who testified that Galloway had not caused any problems during his prior incarceration. This was relevant mitigating evidence that bore on Galloway’s character and prior record. The jury could infer from such evidence, if it chose, that Galloway had the ability “to make a well-behaved and peaceful adjustment to life in prison” and would not pose any danger in the future. Skipper, 476 U.S. at 6-8,106 S.Ct. 1669.
¶ 68. We find no merit in this issue.
7. The exclusion of penalty-phase testimony about prison conditions violated Galloway’s due-process rights and prevented him from presenting relevant mitigating evidence.
¶ 69. This issue is without merit for reasons discussed in the preceding issue.
8. The prosecution engaged in misconduct that requires reversal.
¶ 70. Galloway argues that his conviction and death sentence were based on significant and pervasive prosecutorial misconduct. He contends the prosecution (1) presented and relied heavily upon Dr. McGarry’s scientifically unreliable and, therefore, false and highly misleading testimony; (2) misstated the evidence; (3) vouched for a witness; (4) inflamed the passions and prejudices of the jurors; (5) deflected the jury’s attention from the issues it had to decide; and (6) misstated the law. The State ^argues that Galloway made no contemporaneous objection to preserve these issues for appeal; therefore, they are barred from review. Scott *643 v. State, 8 So.3d 855, 864 (Miss.2008); Caston v. State, 823 So.2d 473, 503-02 (Miss.2002); McCaine v. State, 591 So.2d 833, 835 (Miss.1991). Procedural bar notwithstanding, we will address the merits of this issue.
(1) Dr. McGarry’s testimony
¶ 71. Galloway contends that the prosecution violated the Constitution by presenting Dr. McGarry’s scientifically invalid and therefore false and highly misleading testimony to the jury and relying upon it in closing. This contention already has been addressed. Dr. McGarry’s testimony presented no reversible error, and the State was permitted to rely on it during its summation of the evidence.
¶ 72. The standard of review which this Court must apply to lawyer misconduct during opening statements or closing arguments is “whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.” Sheppard v. State, 777 So.2d 659, 661 (Miss.2000) (citing Ormond v. State, 599 So.2d 951, 961 (Miss.1992)). Attorneys are afforded wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are “inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.” Sheppard, 777 So.2d at 661 (citing Hiter v. State, 660 So.2d 961, 966 (Miss.1995)). The purpose of a closing argument is to fairly sum up the evidence. Rogers v. State, 796 So.2d 1022, 1027 (Miss.2001). The State should convey those facts on the basis of which it asserts a verdict of guilty would be proper. Clemons v. State, 320 So.2d 368, 370 (Miss.1975). “The prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts.” Bell v. State, 725 So.2d 836, 851 (Miss.1998). “Counsel ‘cannot, however, state facts which aré not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.’ ” Sheppard, 777 So.2d at 661 (quoting Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817, 821 (1930)).
(2) Misstating the evidence
¶ 73. Galloway contends that, during closing arguments, the prosecution misstated the testimony of Dr. Ronald Acton, the defense’s DNA expert, by proclaiming that Dr. Acton agreed with certain findings of the State’s DNA expert, Dubourg. First, he claims the State misrepresented that Dr. Acton had “agreed with every [sic] all but two different exhibits that were presented by the crime lab beyond a reasonable doubt that this defendant was responsible for the murder of ... Anderson.” Second, the prosecution twice misrepresented that Dr. Acton had agreed that the tissue found under the Ford Taurus was that of the victim. Galloway also contends the prosecution misstated Du-bourg’s testimony, as she testified that her lab had obtained samples from shoes found at' Galloway’s mother’s house with “possible blood like” substances and a hat with a “soiled” bill. Yet, the prosecution claimed that the shoes and the hat had Anderson’s blood on them.
¶ 74. As the State points out, Dr. Acton essentially acknowledged during cross-examination that the DNA sample taken from the left rear passenger seat was consistent with Anderson’s DNA, testifying that “you can say there is no evidence that she is excluded from having contributed.” Dr. Acton also acknowledged that the DNA sample found underneath the Ford *644 Taurus and the sample taken from the car’s exhaust both were consistent with Anderson’s DNA. The State maintains that Dr. Acton never specifically refuted the State’s DNA proof; rather, Dr. Acton chose to take issue with the testing lab’s statement of findings and statistical conclusion.
¶ 75. As to the prosecutor’s remark regarding blood on the shoes and hat, no objection was entered by the defense. Procedural bar notwithstanding, we find any error here was harmless, given the presence of the victim’s DNA on the items.
(3), (4), and (5) Witness vouching; inflaming the passions and prejudices of the jurors; and deflecting the jury’s attention away from the issues
¶ 76. Galloway claims the State improperly vouched for Brimage and went outside the record when it stated, “[Bri-mage] bravely told us who [Anderson] was talking to by the car, the defendant, Leslie Galloway.” Galloway also contends that this comment improperly inflamed the jurors’ passions and prejudices by suggesting that Brimage had reason to fear Galloway. Galloway further claims that the prosecution inflamed the jurors’ passions and prejudices, which also deflected their attention from the issue they were to decide when the prosecution repeatedly asked Galloway’s mitigation witnesses whether they believed that the punishment should fit the crime.
¶ 77. The State .responds that Galloway has cherry-picked the word “bravely” and is attempting to elevate it to an unconstitutional term of art that inflames passion and prejudice. We find that, whatever the prosecution meant by use of the word, no serious contention can be made that it rendered Galloway’s trial fundamentally unfair.
¶ 78. As to the point of contention with regard to asking whether punishment should fit the crime, we see no problem with such a question. The prosecution’s repeated query should have served to focus the jury on the appropriate punishment for Galloway’s crime.
¶ 79. These arguments are without merit.
(6) Misstating the law
¶ 80. Galloway argues that, during the penalty-phase summation, the prosecution misstated the law by telling the jury that a carjacking conviction “clearly and by law is a conviction involving the use of threat or violence to another person” and that the jury should find the aggravating circumstances that Galloway previously had been convicted of a felony involving the use of threat or violence to another person. He contends that carjacking is not a per se crime of violence, and so carjacking is not per se a conviction meeting the criteria of an aggravating circumstance.
¶ 81. The State submitted evidence during the penalty phase that Galloway previously had been convicted of the crime of carjacking under Mississippi Code Section 97-3-117(1). That Section states:
Whoever shall knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, or attempting to do so, or by any other means shall take a motor vehicle from another person’s immediate actual possession shall be guilty of carjacking.
Miss.Code Ann. § 97-3-117(1) (Rev.2006).
¶ 82. For a prior conviction to qualify as a felony involving the use or threat of violence to a person under Section 99-19-105(b), the conviction must have been made under a statute which has as an element the use or threat of violence *645 against the person or, by necessity, must involve conduct that is inherently violent or presents a serious potential risk of physical violence to another. Holland, 587 So.2d at 874. In Holland, the aggravating prior conviction had occurred in another state. Id. Our holding there, of course, also applies to a Mississippi conviction.
¶ 88. Here, based on the elements set forth in Section 97-3-117(1), we find that the act of carjacking per se involves conduct that presents a serious potential risk of physical violence to another. Therefore, for purposes of Section 99-19-105(b), any conviction made under Section 97-3-117(1) constitutes a felony involving the use or threat of violence to the person. Accordingly, this argument is without merit.
9. Galloway was severely prejudiced by the State’s injection into the trial of nonconfronted hearsay statements.
¶ 84. Galloway claims the trial court violated his Confrontation Clause rights by allowing prejudicial testimonial hearsay statements during the testimony of Investigator Carbine, Lieutenant McClenic, and Dubourg.

A. Carbine

¶ 85. Carbine testified that she found a pair of shoes, a hat, and a New Amsterdam gin bottle in a space she identified as Galloway’s room in his mother’s house. During cross-examination, Carbine stated that she knew the area belonged to Galloway because, when executing the search warrant on the house, his mother pointed out “his living space, the space he occupied while he was there.” Carbine described the space as “a bathroom, with a majority — or all of Galloway’s items belonging to him, clothes hung up, a toilet, it was just an old bathroom.” When asked how she knew items in the room belonged to Galloway, Carbine said, “Because his mother explained to us that those were his things.” On redirect, when asked again how she knew the space belonged to Galloway, Carbine responded, “His mom pointed it out-to us.” Galloway entered an objection at that point on hearsay, which was overruled. Also, Carbine identified cell-phone numbers during her testimony as belonging to Anderson and Galloway. The defense did not object to this testimony.
¶86. Galloway claims on appeal that Carbine’s testimony merely reiterated the mother’s out-of-court statements, which were highly prejudicial. Galloway also contends that Carbine’s identification of the phone numbers contained in the phone records obtained by investigators was prejudicial because: (1) Carbine had no personal knowledge that the phone numbers contained therein belonged to him and Anderson, and (2) the State sought to use the phone records to prove that, since his calls to Anderson abruptly stopped the night she disappeared, this demonstrated consciousness of guilt.
¶ 87. We find that the defense opened the door to what Galloway’s mother told Carbine when defense counsel asked Carbine on cross-examination how she knew the room, and the items contained therein, belonged to Galloway. Thus, Galloway cannot now charge error on appeal. “A defendant cannot complain on appeal of alleged errors invited or induced by himself.” Caston v. State, 823 So.2d 473, 502 (Miss.2002) (quoting Singleton v. State, 518 So.2d 653, 655 (Miss.1988)); see also United States v. Jimenez, 509 F.3d 682, 691 (5th Cir.2007) (rejecting Confrontation Clause challenge to admission of testimony where defense counsel opened the door by asking the witness on cross-examination the basis for his suspicions about defendant). Moreover, state *646 ments admitted, to explain an officer’s course of investigation are generally excepted from the rule against hearsay. See Rubenstein v. State, 941 So.2d 735, 764 (Miss.2006) (citing Rule 803(24) of the Mississippi Rules of Evidence).
¶ 88. As to Galloway’s argument with regard to the phone .records, they were admitted, without objection, under the business-record exception of Rule 803(6) of the Mississippi Rules of Evidence, “which by their nature, are non-testimonial for purposes of the Sixth Amendment.” United States v. Green, 396 Fed.Appx. 573, 575 (11th Cir.2010). Further, no objection was made to Carbine’s statements regarding the phone records. Instead, Galloway chose to question Carbine about the fact that the phone number used by Galloway was actually in Lashon-dra Taylor’s name and that Anderson also had received a number of phone calls from a phone number used by Triplett.

B. McClenic

¶ 89. McClenic testified that Galloway was driving his mother’s white Ford Taurus when.he left her house on December 9, 2008, shortly before law-enforcement personnel arrested him. On cross-examination, McClenic admitted that he was reporting what his deputies had told him. Galloway argues for the first time on appeal that this was hearsay testimony, which was admitted for its truth and damaged his defense. Galloway contends that he conceded his mother’s Taurus was the murder weapon, but he questioned who drove the vehicle. Specifically, the defense maintained that Triplett may have been the person Brimage saw in the Taurus the night Anderson disappeared.
¶ 90. Again, we find that defense counsel invited such information and did so in order to show to the jury that McClenic did not- actually ever see Galloway driving the Taurus.

C. Dubourg

¶91. Galloway argues that Du-bourg testified that her lab received and tested blood samples obtained from the interior of the Taurus for DNA testing, despite there not being any evidence that she had conducted any serological testing herself to confirm that the substance was blood. He contends that the prosecution exploited her hearsay statements as truth during closing arguments, claiming that the substance found in the interior of the car contained Galloway’s blood and Anderson’s blood. Galloway, however, did not object to any of the complained-of testimony or summation. Procedural bar notwithstanding, we find that any error here was harmless, given that the substances collected and tested revealed the presence of both Anderson’s and Galloway’s respective DNA profiles.
¶ 92. This issue is without merit.
10. The trial court committed reversible error by overruling the defense’s objection to speculative and constitutionally unreliable testimony on an important issue.
¶ 93. Galloway submits that one of his theories was that the DNA found in the Taurus may have gotten on the vehicle when it was left unattended overnight at Bob’s Garage in Jackson County after Galloway’s arrest. McClenic testified on cross examination that he did not know whether the owner of the garage or “anyone else” went in and out while the car was stored there. On redirect examination, McClenic blurted out: “The only other person who would have gone in the building is [sic] if he got any more wrecker calls that night.” When defense counsel objected to speculation, McClenic improperly insisted, “Well, I know it to be a fact.” The *647 trial court overruled the objection. Galloway contends that, in so ruling, the trial court committed reversible error.
¶ 94. The State responds that the trial court did not err by overruling Galloway’s objection based on speculation because the testimony was supported by the facts. To place the statement in context, the State has reproduced the relevant portions of McClenic’s testimony beginning with Galloway’s cross-examination of the witness.
Q. All right. Now the ear was towed to Bob’s Garage?
A. Yes, sir.
Q. And you followed it all the way to Bob’s Garage?
A. Yes, sir.
Q. Okay. When you got to Bob’s Garage you said that the car was secured?
A. Yes, sir.
Q. I take it they pulled it inside a building?
A. Yes, sir.
Q. This building have garage doors on it?
A. Yes, sir.
[[Image here]]
A. This building does not have any bays.
Q. It didn’t?
A. No.
Q. Okay. And they had a guard dog there?
A. Yes, sir.
Q. Now, does this guard dog belong to the owner?
A. Yes, sir.
Q. So the owner could control this dog?
A. Yes, sir.
Q. So the owner could go in and out of this building all he wanted, and the dog wouldn’t do anything to him, would it?
A. No, sir.
Q. Okay. Did the owner go in and out of the building while the car was there?
A. Don’t know, sir.
Q. Okay. Did anyone else go in and out of the building while the car was there?
A. I don’t know, sir.
Q. Did you post a police officer or someone there 24 hours a day to watch the car?
A. No, sir.
Q. Okay. So someone else could have gotten into the car, drove the car, touched the car, spilled something in the car, done anything to this car during any period of this time because there wasn’t a police officer there watching the car, was there?
A. I explained to the owner, which is very good-we only use-when we have a car that is involved in a case of this magnitude, we only use certain wreckers that we know is dependable, reliable[,] that has good secured buildings, no employees that would interfere in any way. We don’t use a rotation. We only use a wrecker company that we know is able to secure a vehicle that is used in a homicide. We just don’t use anybody.
[[Image here]]
And I know, you know, if somebody had broke in the building to touch or mess with this car, the alarm would have went off and they would have had to kill the German Shepherd, and the German Shepherd is still alive, so I know they didn’t go in there.
Q. But the bottom line is that you cannot sit here today under oath and say unequivocally that no one touched that *648 garage or had anything to do with that garage before you turned it over to the Harrison County Sheriffs department, can you?
A. No, sir.
¶ 95. The following is from the State’s redirect:
Q. You said an alarm would have gone off at Bob’s?
A. Yes, sir.
Q. There is an alarm at the building?
A. Yes, sir.
Q. Did y’all report back to Bob’s for broken windows or anything that night?
A. No, sir, not that night. I wasn’t there that night.
Q. An alarm go off that night?
A. The only other person who would have gone in the building is [sic] if he got any more wrecker calls that night.
MR. RISHEL [defense counsel]: Your Honor, we object to the speculation.
THE WITNESS: Well, I know it to be a fact.
THE COURT: Overruled.
¶ 96. We find that the trial court did not abuse its discretion in overruling Galloway’s objection. “A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.” M.R.E. 602. As the State points out, McClenic testified only to his belief that no person other than the owner of Bob’s Wrecker Service would have entered the garage while the Ford Taurus was stored there. McClenic’s belief was based on McClenic’s past personal experience and personal observations with the operation of Bob’s Wrecker Service, as established by questions posed by Galloway’s defense attorney on cross-examination. The jury heard McClenic also admit that he could not definitively testify that no one touched the vehicle before it was turned over to authorities.
¶ 97. This issue is without merit.
11. Unwarranted delay in scheduling the trial in this case violated Galloway’s constitutional right to a speedy trial.
¶ 98. Galloway argues that his constitutional right to a speedy trial was violated because 424 days passed between his arrest on December 10, 2008, and the date of his first trial setting, February 8, 2010. Galloway notes in his brief that trial actually began on September 21, 2010. Since the February 8, 2010, trial setting was continued at the request of defense counsel, Galloway does not include the time frame after February 8 in his analysis.
¶ 99. Both the United States Constitution and the Mississippi Constitution provide an accused the right to a speedy and public trial. U.S. Const, amend. VI; Miss. Const. art. 3, § 26. Four factors guide this Court when determining whether an accused’s right to speedy trial has been violated: (1) length of delay, (2) reason for delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the defense suffered any prejudice from the delay. Johnson v. State, 68 So.3d 1239, 1241 (Miss.2011) (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). The Barker factors are to be considered along with other relevant circumstances. Id. at 1242.
¶ 100. According to the record, Galloway was arrested on December 10, 2008. A preliminary hearing was conducted on January 29, 2009. An indictment was returned on June 8, 2009. Galloway filed a motion to dismiss on July 10, 2009, asserting his speedy trial rights. Galloway was *649 formally arraigned on July 23, 2009, at which point trial was set for February 8, 2009. Galloway thereafter filed another motion on July 29, 2009, in which he reasserted his right to a speedy trial. The motion also included a request for a psychiatric evaluation, an omnibus hearing, authorization to obtain experts, and other requests. On July 29, 2009, the trial court issued an order granting Galloway funds for a DNA expert to review the findings of the State’s DNA expert. On August 31, 2009, an agreed scheduling order was entered, with the trial still set for February 8, 2010. On January 13, 2010, the trial court entered an order directing the Harrison County Board of Supervisors to pay for the expenses incurred for the use of the DNA lab in Louisiana. The record contains an invoice from that lab, dated December 29, 2009. On February 11, 2010, the trial court entered a new agreed scheduling order, which set the start of trial on May 10, 2010. In that order, Galloway waived his speedy-trial rights from the original trial date of February 8, 2010, until the new trial date of May 10. On April 27, 2010, the trial court entered an order granting Galloway funds to obtain the services of forensic pathologist Dr. Riddick. On May 4, 2010, Galloway filed a continuance, seeking additional time to consult with Dr. Riddick. In the motion, Galloway contended that defense counsel had received a letter from the State disclosing the opinions of Dr. McGarry, which Galloway claimed were not in the discovery provided to counsel prior to that date. Trial began on September 21, 2010.
¶ 101. On February 11, 2010, the trial court held a hearing to rule on open motions. The court heard arguments from both sides regarding Galloway’s July 29, 2010, motion to dismiss for lack of speedy trial. The prosecution provided a timeline for the trial court. The prosecution informed the trial court that 224 days had elapsed between Galloway’s arrest and his arraignment, and 200 days from the arraignment to the first trial setting, which was February 8, 2010. The prosecution told the trial court at the arraignment that the State and the defense had agreed to a scheduling order. The prosecution also told the trial court that this case involved much DNA evidence and that exhibits had been sent to a lab in Louisiana. Referring to Manix v. State, 895 So.2d 167 (Miss.2005), the prosecution argued that delays caused by backlog of state or federal crime labs constitute good cause for delay. The prosecution further argued that this case involves “expert consultation on behalf of the defense which has also resulted in some delays, and in fact, one of [the defense’s] experts still hasn’t got a report [sic] and won’t have one until May 4th.” The prosecution then argued that Galloway had not established that he had suffered any prejudice as the result of any delay. At this point in the proceedings, as the trial court was doing its calculations, the prosecution told the trial court that “case law states you don’t count the date of arrest.” To which the trial court responded, “Well, that wouldn’t even approach the eight-month requirement. So as far as length of delay, the court finds that there has not been a substantial length in getting this matter to trial.” The trial court also found that both the State and the defense had reason for the delay, as “both needed time to get the extensive evidentiary documents and other evidence analyzed by the Crime Lab and DNA expert.” The trial court acknowledged that the defendant had asserted his speedy-trial right, but found “in light of the fact that the court finds that he is getting a speedy trial, that factor is not involved.” The trial court added: “As most of the cases do point out, what appears to this court to be the most important factor is *650 prejudice to the defendant. And there has been no showing of any prejudice to the defendant by the delay of this trial that is now set for May 10th.”

1.Length of Delay

¶ 102. As the State acknowledges on appeal, Galloway’s constitutional right to a speedy trial attached at the time of his arrest. Price v. State, 898 So.2d 641, 648 (Miss.2005). “In evaluating a speedy trial issue arising under constitutional considerations, as opposed to Mississippi’s statutory scheme, the commencement of the period begins when a person is arrested.” Id. (citing Sharp v. State, 786 So.2d 372, 380 (Miss.2001); Taylor v. State, 672 So.2d 1246, 1257 (Miss.1996)). “The statutory right to a speedy trial attaches and time begins running after the accused has been arraigned.” Adams v. State, 583 So.2d 165, 167 (Miss.1991); see also Miss.Code Ann. § 99-17-1 (Rev. 2007). Galloway’s statutory speedy-trial right appears to be what the prosecutor meant when he told the trial court that “you don’t count the date of the arrest.” Galloway, however, did not assert a statutory violation.
¶ 103. For purposes of a constitutional speedy-trial determination, a delay longer than eight months in bringing a criminal case to trial from the date of arrest is considered “presumptively prejudicial and triggers further analysis of the remaining three Barker factors.” Johnson, 68 So.3d at 1242. A presumptively prejudicial delay does not, however, automatically equate to “actual prejudice.” Id. “Actual prejudice” is determined later in the Barker analysis. Id. Presumptive prejudice “simply marks the point” where the court must then consider the remaining Barker factors, and the burden is shifted to the State to show good reason for delay. Id. (citing Doggett v. U.S., 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)). Here, the 424-day period from Galloway’s arrest until the first trial setting exceeded eight months and is presumptively prejudicial. Thus, we proceed to discuss the other three Barker factors.

2.Reason for Delay

¶ 104. As mentioned, the trial court found both the State and the defense had reason for the delay, as “both needed time to get the extensive evidentiary documents and other evidence analyzed by the Crime Lab and DNA expert.” We agree with Galloway, though, that the State failed to provide any documentation or facts of actual delays in obtaining testing results from the Louisiana crime lab. We do not know when the State submitted its evidence to the lab for testing or when the State received the results. All that the record contains is an invoice from that lab, dated December 29, 2009. In Flora v. State, 925 So.2d 797, (Miss.2006), this Court stressed the importance of making a clear record to allow proper review of speedy-trial claims. That said, the record clearly indicates that this was a complicated case, which required the use of experts for both sides, and it fairly indicates that neither side was ready for trial prior to the eight-month threshold. Indeed, both sides agreed to an initial trial setting of February 8, 2010. Thus, this factor appears close to neutral. But we are unable to reach that conclusion, as the State failed to provide us a more definite record from which to analyze this factor. Accordingly, this factor is weighed slightly against the State.

3.Assertion of the Right to a Speedy Trial

¶ 105. This factor weighs in favor of Galloway, as he asserted his speedy-trial rights.

L Prejudice to Galloway

¶ 106. To assist in analyzing this factor, the Barker Court identified three *651 interests protected by the right to a speedy trial to be considered when determining whether the defendant has been prejudiced by the delay in bringing him or her to trial. These interests are: (a) prevent oppressive pretrial incarceration, (b) minimize anxiety and concern of the accused, and (c) limit the possibility that the defense will be impaired. Barker, 407 U.S. at 532, 92 S.Ct. 2182. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. Id. In State v. Magnusen, 646 So.2d 1275, 1284 (Miss.1994), this Court found presumptive prejudice from a fifteen-month delay between arrest and trial but no actual prejudice; thus, we weighed the prejudice factor against the defendant. This Court looks to such questions as whether witnesses have died or become unavailable, documents or other evidence have been destroyed, or memories have dimmed so that the accused is at a disadvantage which would not have attended him at a prompt trial. Jaco v. State, 574 So.2d 625, 632 (Miss.1990); see also Perry v. State, 419 So.2d 194, 200 (Miss.1982); Wells v. State, 288 So.2d 860, 863 (Miss.1974).
¶ 107. Here, Galloway contends that he was “detained on capital charges, the most serious and anxiety-producing, for several months before a trial date was set.” He further contends that the delayed trial may have affected the reliability of the memory of at least one state witness, Dixie Brimage.
¶ 108. Although Galloway’s pretrial incarceration was lengthy, incarceration alone does not constitute prejudice. Johnson v. State, 68 So.3d at 1245. “Mississippi case law does not recognize the negative emotional, social, and economic impacts that accompany incarceration as prejudice.” Id.
¶ 109. As to Galloway’s contention that the delay may have affected the memory of Brimage, he fails to show us how. Galloway also made no assertion or argument to the trial court as to how he (or his defense) was (or would be) prejudiced by the delay. Instead, Galloway simply sets forth in his brief on appeal the following:
[T]he delayed trial may have affected adversely the reliability of the memory of at least one state witness. See R. 432, 443 (Testimony of Dixie Brimage that she could positively identify Mr. Galloway at the time of trial, two years after she allegedly observed him); R. 442-43 (testifying that she could not identify Mr. Galloway with certainty shortly after the crime from the photo line up at the police station).
¶ 110. Ordinarily, we would dismiss this assertion out of hand for lacking explication. But, since Galloway pulls from this same portion of the record later in issue seventeen, where he attempts to bootstrap his speedy-trial claim alongside the claim that he was prejudiced by Brimage’s “highly suggestive and unreliable in-court identification of [him],” we will relate what these pages of the trial transcript show (as well as a couple of other immediate pages — to keep it in context) and speak to them here.
¶ 111. (Dixie Brimage-Direct Examination, pp. 431-32):
Q. Now as you were standing at the front door tell us what you saw.
A. I saw [Anderson]. She was going by the car, and she was standing by— the car was in front of the driveway, and she was walking out there.
Q. Okay, She walked out there?
A. Yes.
Q. Describe the car that she walked towards.
A. A white Ford Taurus.
*652 Q. Okay. Now was there somebody standing out by this car?
A. Yes.
Q. Who was it?
A. Him.
Q. All right. Now describe, if you would tell us what he’s wearing.
A. A striped shirt and brown khakis.
MR. SMITH: Your Honor, we would ask that the record reflect she’s pointed to and identified the defendant.
THE COURT: All right. The record will so reflect.
[[Image here]]
Q. Okay. Now, how long did she stand outside by this car?
A. About five minutes.
Q. Okay. And what were they doing at that time?
A. Talking.
Q. And did you watch them at the door as they talked?
A. Yes.
(Dixie Brimage — Cross-Examination, pp. 442-43):
Q. Miss Brimage, I will be somewhat brief with you. The man you identified, this defendant, as the person who picked Kela up. I know I’m repeating myself, but you spoke to the police department and [sic] actually showed you a picture of the defendant; is that true?
A. Yes.
Q. And isn’t it true you couldn’t identify him at that point?
A. Yes.
Q. Okay. But here two years later you can identify him, correct?
A. Yes.
Q. Okay. Second can — does the defendant have gold teeth?
A. I can’t see. No.
MR. STEWART: That’s all I have, judge.
THE COURT: All right. Redirect.
(Dixie Brimage — Redirect Examination, pp. 443-45):
Q. Dixie, is it easier for you to identify someone in person rather than a picture?
A. Yes.
Q. Okay. And when they showed you that, how many pictures did they show you that day?
A. Six.
Q. And did you pick one of the pictures?
A. Yes.
Q. All right. And whose picture was it?
A. His.
Q. All right. But you told them you weren’t 100 percent sure that was him?
A. Yes.
Q. Okay, the picture that is.
A. Yes.
Q. Is there any doubt in your mind the man sitting at this table you pointed to is the man who picked her up that day?
A. Yes.
Q. Is there any doubt in your mind?
A. No.
Q. Okay. You said that you were standing at the front door, and it’s a glass screen door, right?
A. Yes.
Q. Is that a clear glass?
A. Yes.
Q. Does grandmama keep that glass pretty clean?
A. Yes.
Q. Did that glass keep you from seeing outside the house that night?
*653 A. No.
Q. All right. Now you were asked on cross-examination if you said anything to him when he got there that night and you said no. Was he there to see you that night?
A. Yes, but he probably didn’t see me.
Q. Okay. Was he there to pick you up or was he there to pick up Kela?
A. Kela
Q. Right. And did he say anything to you?
A. No.
Q. All right. Now, they asked you if your description to the police included gold teeth, right?
A. Yes.
Q. If you would, tell us everything how you described him to the police at that time.
A. He was five-five tall, light skinned, had a belly with gold teeth and hair on his head.
Q. Okay. So he was five foot five inches tall, light skinned and a belly, right and had hair?
A. Yes.
Q. All right. Now, this Ford Taurus that you say you saw him pick her up in that day, as a student, are these Ford Tauruses pretty recognizable to you?
A. Yes.
Q. Why?
A. The [sic] school district cars that we have at our school.
Q. Okay. And is there any doubt in your mind that the defendant picked her up the last night you saw her in this car?
A. No.
¶ 112. Looking at this portion of Bri-mage’s testimony, we find no basis for believing that Galloway was put at an evi-dentiary disadvantage by reason of the delay. Brimage no doubt would have testified with the same effect had the trial been held a week after indictment.
¶ 113. Still, both Galloway and the dissent contend that Galloway demonstrated to the extent possible that he suffered prejudice due to the impact on Brimage’s memory. This is because Brimage, the only eye-witness in the case, was (1) unsure in her identification of the man talking to Anderson; and (2) certain that the man talking to Anderson had gold teeth, and Galloway did not have gold teeth at the time of trial.
¶ 114. First, as the record shows, Bri-mage did actually identify Galloway from a six-photo line-up a few days after the murder, but she told authorities at the time she was not 100 percent certain. Second, we are not at all troubled by the gold-teeth discrepancy. See the case of Thomas v. Dwyer, 2007 WL 2137807at *9 (E.D.Mo. July 23, 2007) for an illustration why.
¶ 115. Because Galloway has failed to show any actual prejudice due to the delay of his trial, this factor weighs in favor of the State.
¶ 116. Upon examination and analysis of the Barker factors, under the totality of the circumstances, we hold that Galloway’s constitutional right to a speedy trial was not violated.
12. The trial court erred by denying the defendant’s proposed sentencing instructions.
¶ 117. Galloway claims the trial court erred by denying his proposed sentencing instructions D2A, D3AA, D4A, and D7A. Since Galloway makes no argument with regard to the denial of D7A, we address only the trial court’s refusal of proposed jury instructions D2A, D3AA, D4A.
*654 ¶ 118. This Court’s standard for review for the denial of jury instructions is as follows:
Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
Chandler v. State, 946 So.2d 355, 360 (Miss.2006) (quoting Ladnier v. State, 878 So.2d 926, 931 (Miss.2004)).
¶ 119. D2A provided:
The Court instructs the jury that should you be unable to agree unanimously on punishment and inform the Court that you are unable to agree, then the Judge shall sentence the Defendant, Leslie Galloway, III, to life imprisonment without parole or hope of early release.
¶ 120. The instruction was denied as cumulative to S-100A (typically referred to as the “long-form instruction”), which provided, in part:
[T]o return the death penalty, you must find that the mitigating circumstances, those which tend to warrant the less severe penalty of life imprisonment without parole, do not outweigh the aggravating circumstances, those which tend to warrant the death penalty.
Consider only the following elements of aggravation in determining whether the death penalty should be imposed;
1. The capital offense was committed by a person under sentence of imprisonment.
2. The defendant was previously convicted of a felony involving the use or threat of violence to another person.
3. The capital offense was committed when the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a sexual battery.
4. The capital offense was especially heinous, atrocious or cruel.
You must unanimously find, beyond a reasonable doubt, that one, or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper:
“We, the jury find the defendant should be sentenced to life imprisonment without parole.”
If one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt, then you must consider whether there are mitigating circumstances which outweigh the aggravating cireumstance(s). Consider the following elements of mitigation in determining whether the death penalty should be imposed:
Any matter, any other aspect of the defendant’s character or record, any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.
If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or over *655 come the aggravating eircumstance(s), you may impose the death sentence.
¶ 121. Galloway argues that, under Mississippi law, a sentence of life in prison without parole is imposed if the jury cannot agree on a sentence. Miss.Code Ann, § 99-19-103 (Rev.2007). Galloway submits that almost all jurors know that a hung jury ordinarily means there will be another trial, before, another jury. Therefore, the jury had a right to know that if they failed to reach an agreement, the trial court would impose a life sentence.
¶ 122. This argument was rejected by the Court in Stringer v. State, in which this Court found:
The argument creates an illusion of prejudice, which has no logical basis. If the jurors were unable to unanimously find that the aggravating circumstances were sufficient to impose the death penalty and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, then they could not return a death sentence. Further, in the event they could not unanimously agree after a reasonable period of deliberation, it would be the trial judge’s duty under Miss.Code Ann. § 99-19-103 to dismiss the jury and impose a sentence of life imprisonment on the defendant.
500 So.2d 928, 945 (Miss.1986) (quoting King v. State, 421 So.2d 1009, 1018 (Miss.1982) (overruled on other grounds)). Here, the trial court properly refused D2A.
¶ 123. D3AA provided:
Each individual juror must decide for themselves whether the death penalty or life imprisonment without parole or probation is an appropriate punishment for the defendant. Even if mitigating circumstances do not outweigh aggravating circumstances, the law permits you, the jury to impose a sentence a life imprisonment without the possibility of parole.
Only if you, the jurors, unanimously agree beyond a reasonable doubt that death is the appropriate punishment may you impose a sentence of death.
The trial court found that S-100A’s inclusion of the sentence, “in the event that you find the mitigating circumstances do not outweigh or overcome the aggravating circumstances, you may impose the death penalty,” adequately stated the proposition in the defense’s proposed D3AA.
¶ 124. Galloway contends, however, that S-100A did not expressly inform the jury that it could impose a life sentence even if it found that the mitigating circumstances did not outweigh the aggrávators.
¶ 125. In Thorson v. State, 895 So.2d 85 (Miss.2004), the trial court denied an almost‘identical sentencing instruction. We affirmed, holding that the “instruction is nothing more than a mercy instruction and was properly refused by the trial court.” Id. at 108; see also Walker v. State, 913 So.2d 198, 248-49 (Miss.2005) (in which we upheld the trial court’s refusal of a similar instruction on the basis that it constituted a “mercy” instruction); Edwards v. State, 737 So.2d 275, 317 (Miss.1999) (same); Watts v. State, 733 So.2d 214, 241 (Miss.1999) (same); Foster v. State, 639 So.2d 1263, 1300 (Miss.1994) (same); Ladner v. State, 584 So.2d 743, 761 (Miss.1991) (holding that a defendant has no right to a mercy instruction); Williams v. State, 544 So.2d 782, 788 (Miss.1987) (same); Cabello v. State, 471 So.2d 332, 348 (Miss.1985) (same). Accordingly, the trial court properly refused D3AA.
¶ 126. D4A provided:
A mitigating circumstance is any fact relating to the Defendant’s character or history, or any aspect of the crime itself, which may be considered extenuating or reducing the moral culpability of the killing or making the Defendant less deserving of the extreme punishment of *656 death. In offering mitigating circumstances, the Defendant is not suggesting that the crime is justifiable- or excusable. Mitigating circumstances are those circumstances that tend to justify the penalty of life imprisonment without parole as opposed to death.
The trial court refused the instruction because it was included elsewhere. Galloway, however, contends that he was entitled to an instruction that adequately defined what is a mitigating circumstance.
¶ 127. This Court addressed a similar issue Branch v. State, 882 So.2d 86 (Miss.2004). There, Lawrence Branch, who was sentenced to death for capital murder, complained the trial court erred by refusing his proposed instruction defining “mitigation.” Id. at 72. Branch argued that mitigation is a legal term which is not commonly understood. Id. The Branch Court reviewed a previous decision in which where a similar argument was denied. Id. (citing Booker v. State, 449 So.2d 209, 218-19 (Miss.1984)). The Branch Court then held that, since the trial court had given the “standard long-form sentencing instruction informing the jury how to consider aggravating and mitigating circumstances,” and that instruction tracked statutory language, the defense’s proposed mitigation instruction was appropriately denied. Id. at 69, 72.
¶ 128. Similarly, we find Galloway’s proposed mitigation instruction D4A was sufficiently covered in the long-form instruction; thus, the trial court did not err in refusing it.
¶ 129. This issue is without merit.
13. The court erred in sustaining the State’s objections to defense counsel’s closing arguments at the sentencing.
¶ 130. Galloway argues that the trial court erroneously sustained the prosecution’s objections to the defense’s argument pointing out the weakness of the State’s evidence of sexual battery and the argument that a sentence of life without parole would “end all of the killing in this situation.” Galloway contends these rulings, individually and cumulatively, violated his rights under Mississippi law and under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article 3, Sections 14, 24, 26, and 28 of the Mississippi Constitution, including his right to closing argument, a constitutionally guaranteed, basic element of the adversary process.
¶ 131. During the penalty phase, the defendant is limited to introducing evidence relevant to his sentence. Holland, 705 So.2d 307 (Miss.1997) (citing Jackson v. State, 337 So.2d 1242, 1256 (Miss.1976)). The defendant generally may present any relevant mitigating evidence. Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982). Both the State and the defendant shall be permitted to present arguments for and against the sentence of death. Miss.Code Ann. § 99-19-101(1) (Rev.2007).
¶ 132. Here, defense counsel addressed the jury as follows:
What made it capital murder was that you decided that there was, based on what Dr. McGarry said, there was sexual battery. So I want to talk about that for a second.
This sexual battery that Dr. McGarry testified to, what did he say. He said that she had a three quarter inch cut, abrasion, tear, use whatever, word you think is proper, to her anus. Three quarters of an inch. About that far. That’s how long this cut was that he said was caused by a sexual battery. Some-
*657 one trying to penetrate her. And from that three quarter inch cut, that one cut, that one injury, he made the quantum leap to sexual battery.
There wasn’t any other evidence of sexual battery. No sperm. No other kinds of injuries nothing. Just that, that three quarter inch cut about that long on her anus.
MR. HUFFMAN: Your Honor, I would object to the — this argument based on the fact that the guilty phase has already been established.
THE COURT: Sustained.
MR. RISHEL: Your Honor, I would argue that they introduced all of the facts as part of the aggravating circumstances and made it part of it. So I should be able to comment on it. That’s all I’m doing here.
THE COURT: All right. But don’t challenge the jury with regard to the decision that they’ve already made.
¶ 138. The State relies on Holland II for its argument that evidence of innocence or “residual doubt” is not a mitigating factor during the sentencing phase. Holland, 705 So.2d at 324. Holland II addressed whether Holland was barred from reintroducing evidence to dispute guilt at resentencing phase, to rebut aggravators offered by the prosecution, to dispute the Enmund factors which the prosecution must prove for imposition of the death penalty, or to support an argument on residual doubt. Id. at 321; see also Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376-77, 73 L.Ed.2d 1140 (1982). Holland II held that, because of the finding of guilt by the prior jury, Holland was barred by res judicata from relit-igating the prior jury verdict of guilt and was collaterally estopped in the proceedings from attacking his guilt. Id. at 325. Drawing from Franklin v. Lynaugh, 487 U.S. 164, 172-73, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988), Holland II added there could be no error in denying Holland the right to argue residual doubt, since it was not a mitigating factor that is constitutionally recognized. Id. at 326. Notably, in a footnote, Holland II opined: “Residual doubt may have a place in a sentence phase conducted before the same jury that convicted a capital defendant. However, there is no residual doubt of guilt to be argued in cases such as that at bar.” Id. at n. 7.
¶ 134. In Franklin, the Supreme Court said:
Our edict that, in a capital case, “ ‘the sentencer ... [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense,’ ” Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett, 438 U.S. at 604, 98 S.Ct. at 2964), in no way mandates reconsideration by capital juries, in the sentencing phase, of their “residual doubts” over a defendant’s guilt. Such lingering doubts are not over any aspect of petitioner’s “character,” “record,” or a “circumstance of the offense.” This Court’s prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.
Franklin, 487 U.S. at 174, 108 S.Ct. 2320. In Oregon v. Guzek, 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006), the Supreme Court reaffirmed Franklin, finding no constitutional right to introduce residual-doubt evidence at sentencing. In Ross v. State, 954 So.2d 968, 1011-12 (Miss.2007), this Court, citing Franklin and Holland II, held that a capital defendant is not entitled to a jury instruction on residual doubt. In Minnick, this Court, in construing Franklin, expressed that “where a defendant argues residual doubt *658 to the jury, which a defendant is free to do to a relevant extent, the defendant’s right to have a jury consider residual doubt is not impaired by the trial court rejecting an instruction on residual doubt.” Minnick, 551 So.2d at 95 (citation omitted).
¶ 135. Here, the State contends that Galloway was allowed to argue “residual doubt,” because, even though the trial court technically sustained the objection, the trial court permitted the defense to point out alleged weaknesses in the evidence. The State points to the following argument defense counsel made to the jury immediately after the trial court sustained the prosecution’s objection:
MR. RISHEL: Yes, sir, I agree. [Speaking to the jury]:
And I hope — I don’t want to confuse you. I’m not trying to challenge your decision. You made your decision, and I respect that. But my point is that if the facts of this case are going to be presented as an aggravating factor, then certainly I can comment on them and try to show you the points that I think would mitigate those factors, would mitigate the facts. Things that you should consider.
I think one of them is that. She had a broken pelvis and she had a puncture wound to her leg. Remember Detective Carbine talked about that. She had a puncture wound in her leg. Dr. McGar-ry said, she didn’t have any wounds to this area. What about that puncture wound.
MR. HUFFMAN: Same objection, Your Honor. He’s challenging the verdict of the guilt phase. ■
THE COURT: Overruled on that argument.
¶ 136. The State contends this exchange shows that the trial court was not disallowing the “residual doubt” argument but was concerned that the defense was attempting to challenge guilt.
¶ 137. We agree. The trial court properly admonished defense counsel not to challenge the jury with regard to its guilty verdict. The court, in its discretion, allowed the defense to question the State’s evidence in the case with regard to the aggravating factors. Accordingly, we find this point of contention is without merit.
¶ 138. As to Galloway’s next assignment of error, defense counsel argued to the jury:
The bottom line is, you don’t need to do that. You don’t need to kill Leslie Galloway. You can send him to jail for the rest of his life, and he will die there in jail. That is punishment. And there’s one other thing that that would do. There’s one other effect that that would have if you decide that Mr. Galloway should go to jail for the rest of his life. And it would be a good thing. It would end all of the killing in this situation, wouldn’t it.
The prosecution objected at that point and the trial court sustained the objection. Galloway claims this violated his constitutional right to plead for mercy. The State argues that, while not articulated, the trial court likely sustained the objection on the basis that defense counsel’s argument improperly enticed the jury.
¶ 139. Defense counsel’s argument was not improper. King v. State explains:
Miss.Code Ann. § 99-19-101(1) provides in pertinent part: “The state and the defendant and/or his counsel shall be permitted to present arguments for or against the sentence of death.” Clearly, it is appropriate for the defense to ask for mercy or sympathy in the sentencing phase. It is equally appropriate for the state to further its goal of deterrence by arguing to “send a message” in the sentencing phase. Both of these arguments are recognized as legitimate considerations to be had by those who argue “for or against” the death penalty. In Hum *659 phrey v. State, 759 So.2d 368, 374 (Miss.2000), we allowed the prosecution to present a “send a message” argument to the jury during the sentencing phase of a bifurcated capital trial. We based our decision on Wells v. State, 698 So.2d 497, 513 (Miss.1997), where we chose “not to fault the prosecution for arguing that the ‘message’ conveyed by a death penalty verdict would be different than that urged by the defense.” We stated, “To do so would be disingenuous given the inescapable reality that deterrence is, in fact, an established goal of imposing the death penalty, which goal necessarily entails, to some extent, sending a message.”
We today follow the above-cited statute and hold that in closing argument during the sentencing phase each side may argue its respective position on the death penalty. Of course, neither side may ever argue these positions during the guilt phase; for a conviction or an acquittal must be based solely on law and fact. It should be noted further that neither side is entitled to a jury instruction regarding mercy or deterrence. To the extent that our holding is contrary to previous case law on the subject, those cases are expressly overruled.
King v. State, 784 So.2d 884 (Miss.2001).
¶ 140. Though the trial court erred by sustaining the State’s objection, we find the error harmless. The jury already had heard the remark, and the jurors had been instructed that counsels’ arguments were not evidence.
14. The trial court committed plain and reversible error by requiring the defense to disclose pretrial “the general nature of the defense.”
¶ 141. Galloway claims for the first time on appeal that disclosures by his defense during an omnibus hearing relating the general nature of his defense violated his right against self-incrimination and Rule 9.04 of the Uniform Rules of Circuit and County Court Practice. The hearing took place prior to trial, and the results were reduced to a court order without objection.
¶ 142. The portion Galloway now argues was objectionable is as follows:
11(a) The defense attorney states the general nature of the defense is:
1. Lack of knowledge or contraband;
2. Lack of special intent;
3. Diminished mental responsibility;
4. Entrapment;
5. General denial. Put prosecution to proof.
(bold transcription in original). The bold portions indicate Galloway’s anticipated defense as acknowledged by trial counsel at the omnibus hearing.
¶ 143. Galloway is correct that Rule 9.04 does not require pretrial disclosure of a criminal defendant’s general defense. But, as the State points out, it does not proscribe such disclosure either.
¶ 144. Rule 9.05 requires a criminal defendant to disclose his or her intention to use an alibi defense. See URCCC 9.05. The United States Supreme Court spoke to such a requirement in Williams v. State of Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), in which it approved Florida’s Notice of Alibi Rule, which is substantially similar in many respects to Rule 9.05. The Supreme Court said:
The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until *660 played. We find ample room in that system, at least as far as “due process” is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.
Id. at 82, 90 S.Ct. 1893.
¶ 145. Other jurisdictions provide for disclosure of defenses a criminal defendant intends to use at trial. Arkansas has a criminal rule of procedure which requires disclosure of defenses to be used at trial where the prosecuting attorney requests it. Arkansas Rule of Criminal Procedure 18.3 states:
Subject to constitutional limitations, the prosecuting attorney shall, upon request, be informed as soon as practicable before trial of the nature of any defense which defense counsel intends to use at trial and the names and addresses of persons whom defense counsel intends to call as witnesses in support thereof.
California has a similar rule, which provides:
Subject to constitutional limitations, the defense shall disclose to the prosecution the nature of any defense, other than alibi, which the defense intends to use at trial. The defense shall also disclose the names and addresses of persons whom the defense intends to call as witnesses at trial.
Cal. R.Crim. P. 16(II)(c).
¶ 146. Finding no constitutional violation in requiring a criminal defendant to disclose the general nature of defenses to be used at trial and based on Galloway’s failure to object to the trial court’s order, this point of contention fails under plain-error review.
15. The court erred in overruling defense counsel’s objection to Bonnie Dubourg’s expert qualifications and in allowing her unreliable testimony.
¶ 147. At trial, Galloway objected to Dubourg’s expert testimony based upon her not having a Ph.D. degree. The trial court overruled the objection, finding that qualifications for an expert do not require that she have a Ph.D. The trial court found that, by her education, training, and experience, Dubourg was qualified to testify as a forensic DNA analyst, and that she would be allowed to give opinions consistent with Rule 7.02 of the Mississippi Rules of Evidence.
¶ 148. This Court reviews a trial court’s decision to accept expert testimony for an abuse of discretion. Smith v. State, 925 So.2d 825, 834 (Miss.2006). Acceptance or refusal of expert testimony falls within the sound discretion of the trial court, and this Court will reverse a trial judge’s decision only if it was “arbitrary and clearly erroneous.” Poole v. Avara, 908 So.2d 716, 721 (Miss.2005).
¶ 149. Rule 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
M.R.E. 702.
¶ 150. The record shows that Dubourg earned a bachelor of arts in biology in 1978. She has sixteen years’ experience *661 working with bodily fluids in the forensics field. At the time of trial, she had ten years’ experience working as a DNA analyst. She has testified in other courts as a forensic DNA analyst approximately thirty times and approximately fifteen times as a serologist. Her training is continual and includes regular attendance at conferences, seminars, and on-the-job training. Because she works for an “accredited lab,” she is required to participate in “continuing education” annually. She also is required to submit to proficiency testing twice a year.
¶ 151. Given Dubourg’s experience and training analyzing forensic DNA, combined with her education, we find that the trial court did not abuse its discretion in allowing Dubourg to testify as an expert in this matter.
16. The trial court committed reversible error by allowing the admission of DNA statistical probabilities generated by the FBI software program and its CODIS database without providing Galloway the opportunity to confront the person who created the program and database.
¶ 152. Galloway contends that the trial court committed reversible error when it allowed, through Dubourg’s testimony, the admission of out-of-court statistical probability assessment calculated by a software program without first providing him the opportunity to confront: the estimates used in the software program; the program’s ability to calculate statistics for a DNA mixture; or the program’s ability to calculate statistics where some of the defendant’s alleles are missing.
¶ 153. The State argues that the issue is waived for Galloway’s failure to lodge a contemporaneous objection at trial. We agree.
¶ 154. Procedural bar notwithstanding, we find no Confrontation Clause violation in the admission of this information. The testimonial hearsay at issue is the data that Dubourg relied upon in reaching her opinion regarding statistical probability assessments for DNA mixtures. On direct examination, Dubourg repeatedly identified Anderson’s and Galloway’s DNA, respectively, as being present on or in various pieces of evidence collected from underneath, inside and outside the Ford Taurus, as well as Galloway’s residence. When Dubourg was asked to identify the DNA extracted from a particular piece of evidence, she typically would state to whom the DNA belonged and offer that the probability of finding the same DNA profile if the DNA had come from a randomly selected individual other than Anderson or Galloway was approximately one in more than 100 billion. Du-bourg explained that the one-in-more-than-100-billion probability is generated from a statistical program called “pop stat” that was developed by the Federal Bureau of Investigations (FBI). She testified that the pop stat system is generally accepted and used by crime labs that have access to the CODIS database.[5]
¶ 155. The Kansas Supreme Court addressed a similar question in State v. Appleby, 289 Kan. 1017, 221 P.3d 525 (2009). There, the defendant argued that he was denied the opportunity to cross-examine the FBI’s random-match probability estimates because the witnesses presented at trial did not prepare the CODIS database and had no personal knowledge of the *662 methods and procedures the FBI used to compute the statistical estimates or the set of data upon which the calculations were based. Appleby, 221 P.3d at 549. In finding no Confrontation Clause violation, the Appleby Court reasoned:
[A]pplying the tests utilized in Melendez-Diaz, we conclude the population frequency data and the statistical programs used to make that data meaningful are nontestimonial. We first note that DNA itself is physical evidence and is nontestimonial. Wilson v. Collins, 517 F.3d 421, 431 (6th Cir.2008); United States v. Zimmerman, 514 F.3d 851, 855 (9th Cir.2007); see also Schmerber v. California, 384 U.S. 757, 765, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that “blood test evidence, although an incriminating product of compulsion, [is] neither ... testimony nor evidence relating to some communicative act or writing” and is therefore not protected by the Fifth Amendment).
Placing this physical evidence in a database with other physical evidence— i.e., other DNA profiles — -does not convert the nature of the evidence, even if the purpose of pooling the profiles is to allow comparisons that identify criminals. See 42 U.S.C.' §§ 14132(b)(3), 14135e (2006) (stating purposes of CO-DIS and clearly recognizing use during trial when rules of evidence allow). The database is comprised of physical, non-testimonial evidence. Further, the acts of writing computer programs that allow a comparison of samples of physical evidence or that calculate probabilities of a particular sample occurring in a defined population are nontestimonial actions. In other words, neither the database nor the statistical program are functionally identical to live, in-court testimony, doing what a witness does on direct examination. Rather, it is the expert’s opinion, which is subjected to cross-examination, that is testimonial.
[[Image here]]
Here, as explained in the testimony in this case, the database and the statistical program are accepted sources of information generally relied on by DNA experts. Based on this scientific data— which by itself is nontestimonial — the experts in this case developed their personal opinions. See State v. Dykes, 252 Kan. 556, 562, 847 P.2d 1214 (1993). These experts were available for cross-examination and their opinions could be tested by inquiry into their knowledge or lack of knowledge regarding the data that formed the basis for their opinion. Consequently, the right to confront the witnesses was made available to Apple-by.
Id. at 551-52.
¶ 156. This is persuasive reasoning from the Kansas Supreme Court. Likewise, we too view this type of information as nontestimonial. This issue is without merit.
17. Dixie Brimage’s highly suggestive and unreliable in-court identification of Galloway violated his constitutional rights and mandates reversal.
¶ 157. Citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), Galloway argues on appeal that, as the only eyewitness in the case, Brimage’s in-court identification of Galloway as the driver of the vehicle was unreliable, suggestive, and highly prejudicial, and requires reversal. Without it, the State would have been stuck with Brimage’s inconclusive photo identification and her previous description to the police of a man with gold teeth who could not have been Galloway because he did not have gold teeth. And this would have strengthened *663 his defense at trial that another person may have been in the car, and that person may have been Triplett.
¶ 158. At trial, Brimage identified Galloway in court, with no objection raised by the defense. She described him as the man she saw standing by the white Ford Taurus parked in her grandmother’s driveway and who drove the vehicle away with Anderson inside.
¶ 159. We find that Galloway waived this assignment of error by not entering an objection to Brimage’s in-court identification of him at trial. McQuarter v. State, 574 So.2d 685, 687-88 (Miss.1990). Galloway’s contention also fails under plain-error review.
¶ 160. Notably, Galloway made no assertion at or before trial that Brimage’s out-of-court identification was either improper or unnecessarily suggestive, nor does he do so on appeal. He now simply claims that Brimage’s in-court identification of him was inherently and impermissi-bly suggestive because he was the defendant; thus, it should have been excluded.
¶ 161. At the outset, we find that Galloway’s reliance on Biggers and the five reliability factors described therein misses the mark. In Biggers, the Supreme Court said “[i]t is the likelihood of misidentification which violates a defendant’s right to due process.” Biggers, 409 U.S. at 198, 93 S.Ct. 375. “Biggers recognized the identification problem could come about in two different evidentiary situations: (1) an in-court identification based upon a suggestive pretrial identification procedure, and (2) testimony pertaining to the out-of-court suggestive identification proceeding itself.” York v. State, 413 So.2d 1372, 1381 (Miss.1982). Biggers held that, in order to satisfy due process, pretrial identifications resulting from a suggestive process must be examined under the totality of the circumstances in order to determine the identification’s reliability. Biggers, 409 U.S. at 199-200, 93 S.Ct-. 375. The reliability of a pretrial identification resulting from a suggestive process depends on: (1) the witness’s opportunity to view the accused at the time of the crime, (2) the degree of attention exhibited by the witness, (3) the accuracy of the witness’s prior description of the criminal, (4) the level of certainty exhibited by the witness at the confrontation, and (5) the length of the time between the crime and the confrontation. Id. As recognized in Latiker v. State, 918 So.2d 68, 74 (Miss.2005), Biggers essentially prescribes a two-step inquiry for allegations of an impermissible identification: (1) the court must first determine whether the identification was unduly suggestive; if that inquiry is answered affirmatively, then (2) the court must determine whether, under the totality of the circumstances and using the five Biggers factors, the identification was nevertheless reliable.
¶ 162. The United States Supreme Court has not decided whether Biggers applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification. See, e.g., United States v. Domina, 784 F.2d 1361, 1369 (9th Cir.1986), cert. denied, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987) (“The Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting.”). A majority of courts have concluded that Biggers does not apply to strictly in-court identifications. Byrd v. State, 25 A.3d 761, 767 (Del.2011). See also State v. Lewis, 363 S.C. 37, 609 S.E.2d 515, 518 (2005), where the South Carolina Supreme Court concluded, “as the majority of [courts] have,” that Biggers “does not apply to a first-time in-court identification because the judge is present and can adequately address relevant problems; the jury is physically present to witness the identification, rather than merely hearing *664 testimony about it; and cross-examination offers defendants an adequate safeguard or remedy against suggestive examinations.”
¶ 163. The Georgia Supreme Court has reasoned:
Because pretrial identification procedures occur beyond the immediate supervision of the court, the likelihood of misidentification in such cases increases, and courts have required that pretrial identification procedures comport with certain minimum constitutional requirements in order to ensure fairness. These extra safeguards are not, however, applicable to ... the in-court identification ... [here]. Rather, [such] testimony is subject to the same rules of evidence, witness credibility, and cross-examination as all testimony in a criminal trial.
Ralston v. State, 251 Ga. 682, 309 S.E.2d 135, 136 (1983). See also United States v. Bush, 749 F.2d 1227, 1231 (7th Cir.1984), cert. denied, 470 U.S. 1058, 105 S.Ct. 1771, 84 L.Ed.2d 831 (1985) (“deference shown the jury in weighing the reliability of potentially suggestive out-of-court identification would seem even more appropriate for in-court identifications where the jury is present and able to see first-hand the circumstances which may influence a witness”); People v. Medina, 208 A.D.2d 771, 772, 617 N.Y.S.2d 491 (1994) (“where there has not been a pretrial identification and defendant is identified in court for first time, defendant is not deprived of fair trial because defendant is able to explore weaknesses and suggestiveness of identification in front of the jury”); State v. Smith, 200 Conn. 465, 470, 512 A.2d 189 (1986) (defendant’s protection against obvious suggestiveness in courtroom identification confrontation is his right to cross-examination); People v. Rodriguez, 134 Ill.App.3d 582, 89 Ill.Dec. 404, 480 N.E.2d 1147, 1151 (1985), cert. denied, 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986) (“Where a witness first identifies the defendant at trial, defense counsel may test perceptions, memory, and bias of the witness, contemporaneously exposing weaknesses and adding perspective to lessen hazards of undue weight or mistake.”).
¶ 164. Here, we see no reason to expand the Biggers two-step inquiry to an in-court identification where no impermis-sibly suggestive pretrial identification is alleged to have preceded it. The trial itself affords the defendant adequate protection from the general inherent suggestiveness present at any trial. The defendant receives the full benefit of a trial by jury, presided over by an impartial judge, with representation by counsel, and witnesses subject to oath and cross-examination.
¶ 165. The extent to which there were inconsistencies between Brimage’s pretrial identification and her subsequent in-court identification goes to the weight of the evidence, not to its admissibility. This issue is without merit.
18. The court’s failure to respond adequately to the jury note regarding the critical issue in the case resulted in a reasonable probability that at least some jurors convicted Galloway for having consensual, vaginal sex with Anderson, “conduct that is not crime.”
¶ 166. This argument was addressed in issue two. It is without merit.
19. The evidence was insufficient to sustain the predicate felony of sexual battery and thus insufficient to sustain Galloway’s capital-murder conviction.
¶ 167. Galloway contends that, if Dr. McGarry had given scientifically valid tes *665 timony that the injury was consistent with nonconsensual, anal penetration, the evidence would have been insufficient to support a finding of guilt beyond a reasonable doubt as to the predicate felony of anal sexual battery. For support, Galloway cites Williams v. State, 35 So.3d 480, 485-87 (Miss.2010), in which, he contends, this Court found evidence of sexual battery insufficient when the only evidence that the child victim had been abused was the testimony of the State’s expert that the child’s anal injuries were “very consistent with anal penetration.” Galloway further claims that the State failed to adduce sufficient evidence establishing that the alleged anal penetration was nonconsensual or that it must have occurred within the time Galloway was known to be around Anderson, because Dr. McGarry described the tear only as “fresh,” but otherwise gave no timeframe for it. Galloway maintains that, in light of Anderson’s history with Galloway and at least one other sexual partner, the State’s evidence was insufficient to establish that the alleged penetration occurred during the commission of Anderson’s murder, as required under Mississippi Code Section 97-3-19(2)(e).
¶ 168. In deciding whether the State presented legally sufficient evidence to support a jury’s verdict, this Court must determine whether, when viewing the evidence in the light most favorable to the State, any rational juror could have found that the State had proved each element of the crime charged beyond a reasonable doubt. Bush v. State, 895 So.2d 836, 843 (Miss.2005). Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993).
¶ 169. At the outset, we find Williams distinguishable from this case. There, the defendant was convicted on two counts of sexual battery, one against each of his two daughters. Williams, 35 So.3d at 483. The defendant challenged the sufficiency of the evidence supporting the sexual-battery charge in Count II against his younger, ten-month-old daughter. Id. at 485. This Court reversed and rendered Count II because the State’s only evidence on that count was the doctor’s testimony, and the doctor had couched his opinion in terms of “suspicion of probability.” Id. at 485-87, 492. On Count I, the doctor had testified that the older child’s injuries were “ ‘definitely consistent’ with someone who had been sexually abused ‘to a reasonable degree of medical certainty.’ ” Id. at 486. But the doctor “did not recount his findings in such unequivocal terms” when discussing the younger daughter. Id.
¶ 170. Here, Dr. McGarry did not use the phrase, “to a reasonable medical certainty.” But, unlike the physician in Williams, Dr. McGarry expressed his opinion with the requisite certainty necessary to deem it reliable. Again, when asked on direct examination whether he had an expert opinion as to what caused the injury to the victim’s anus, Dr. McGar-ry stated:
My impression is that it was forceful penetration of the anus that caused injury to the — what is called the sphincter or the muscle ring around the anus that ordinarily is less than a fourth of inch in diameter, stretched out to more than an inch in diameter by the penetration of the anal canal. It’s evidence of anal rape.
¶ 171. Dr. McGarry’s opinion was predicated on his findings that:
The anus had stretching type injuries. The rectal opening, the anus, had the kind of injuries that occur with forceful *666 penetration, with stretching, abrasion or rubbing of the lining of the anus and a tear, so that the anus had been stretched to a point where the tissue ripped up inside the anus canal.
[[Image here]]
The tearing went about an inch, three quarters to an inch up inside the anus above the muscular closure of the anus up inside the lining of the anus.
[[Image here]]
The anus has a ring of muscle around it which normally is closed. When it’s forced open by penetration, the lining is rubbed away, and she had that rubbing injury around her anus. And then up inside where the full stretching had occurred there was a tear, a fresh tear.
¶ 172. In Catchings v. State, 684 So.2d 591 (Miss.1996), this Court thoroughly addressed the use of the phrase, to a reasonable medical certainty, as follows:
The issue here is whether medical experts are required to state their opinions “to a reasonable medical certainty” in order that their opinions be given probative value and therefore be admissible as evidence. Although this Court has not addressed this specific question, this Court can find analysis of the issue under the Federal Rules of Evidence, a course to which this Court has looked for analysis in other issues. Hopkins v. State, 689 So.2d 1247, 1250 (Miss.1993) (citing Johnson v. State, 529 So.2d 577, 587 (Miss.1988)). Further analysis of the federal rule and the Mississippi rule of evidence at issue here does not reveal a conflict exists between the two rules.
A similar challenge was made in the federal case of LeMaire v. United States, 826 F.2d 949 (10th Cir.1987), when the plaintiff argued that the testimony of the defense’s medical expert was “not competent because he failed to state his opinions in terms of a “reasonable degree of medical probability.” Applying Colorado substantive law that a medical opinion is admissible if founded on reasonable medical probability, the federal court held the expert testimony admissible. Further, the court held “the fact that the expert cannot support his opinion with certainty goes only to its weight not its admissibility.” Id. at 953.
In the federal case of Schulz v. Celotex Corporation, 942 F.2d 204 (3rd Cir. 1991), the court also held that an attending physician’s failure to use the words “reasonable medical certainty” did not require exclusion of the testimony. The use of the word “certainty” is more applicable to Mississippi’s rule of evidence and cases interpreting it. The analysis in Schulz is as follows:
One commentator has explained that “there is nevertheless an undercurrent that the expert in federal court express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate.” Hullverson, Reasonable Degree of Medical Certainty: A Tort et a Travers, 31 St. Louis U.L.J. 577, 582 (1987). To that extent, the phrase “with a reasonable degree of medical certainty” is a useful shorthand expression that is helpful in forestalling challenges to the admissibility of expert testimony. Care must be taken, however, to see that the incantation does not become a semantic trap and the failure to voice it is not used as a basis for exclusion without analysis of the testimony itself. LeMaire v. United States, 826 F.2d 949, 954 (10th Cir.1987) (applying state law, entire testimony examined to determine if opinion expressed with the requisite degree of certainty). *667 Situations in which the failure to qualify the opinion have resulted in exclusion are typically those in which the expert testimony is speculative, using such language as “possibility.” State v. Harvey, [121 N.J. 407,] 581 A.2d [483] at 495 [ (1990) ]; Mayhew v. Bell S.S., 917 F.2d [961] at 963 [ (6th Cir. 1990) ] (Expert testified: “suspicious that it could have been”); Grant v. Farnsworth, 869 F.2d [1149] at 1152 [ (8th Cir.1989) ] (“could only guess”); Kirschner v. Broadhead, 671 F.2d 1034, 1039-40 (7th Cir.1982) (possibility is not an affirmative basis for a finding of fact). Phrases like “strong possibility,” or “20-80% probability,” also invite speculation. Chaney v. Smithkline Beckman Corp., 764 F.2d 527, 529-30 (8th Cir.1985).
In some cases, the courts are more demanding in requiring a degree of certainty in predictions of future consequences.
Accordingly, while the particular phrase used should not be dispositive, it may indicate the level of confidence the expert has in the expressed opinion. Perhaps nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision. McMahon v. Young, 442 Pa. 484, 276 A.2d 534, 535 (1971).
Id. at 597 (citations and footnote omitted).
¶ 173. Here, as found in the first issue, Dr. McGarry’s opinion that the anal tear was evidence of “anal rape” did not go beyond his scope of expertise and did not improperly invade the province of the jury. The State’s evidence as a whole, which included the crime scene, the condition of the body, the victim’s defensive wounds, the “fresh” injury to her anus, was sufficient to sustain the jury’s ultimate determination that Galloway committed sexual battery against Anderson, and the act occurred during the commission of her murder. This issue is without merit.
20. The court erred in ruling inadmissible evidence of the victim’s prior sexual behavior, including letters found in her school locker.
¶ 174. Galloway argues that he had a right under the Mississippi Rules of Evidence and the United States and Mississippi Constitutions to present evidence of prior sexual behavior of the victim to demonstrate that (1) any sexual behavior between him and Anderson was consensual; and/or (2) another person caused her anal injury and was the source of the DNA found her vaginal cavity.
¶ 175. Prior to trial, the State moved in limine to exclude any evidence of Anderson’s prior sexual activity, including letters found in Anderson’s school locker. The letters were addressed to “Demetri Lamar Brown,” and signed “Shakeylia.” One of the letters contained a sexually graphic solicitation for oral sex, and closed with: “Demetree and Shakeylia FOR EVER. I love you.” Galloway contends the trial court ruled that he could introduce evidence of prior sexual activity between him and Anderson only if he took the stand. And the court would not allow the defense to call witnesses to testify that they had sex with Anderson. Galloway argues that the trial court’s rulings violated Rule 412(c) of the Mississippi Rules of Evidence, and denied him due process or a fair trial.
¶ 176. The State argues the motion was granted to the extent that the defense might offer testimony of Anderson’s prior sexual conduct, excluding any such contact *668 between her and Galloway. The State maintains that the trial court left open the possibility that the defense might be able to show the nature and extent of Anderson’s relationship with Galloway, and the trial court clarified its ruling: “I think if the DNA experts come in here and say they found DNA from two different persons, that’s admissible. But my ruling is to the extent that you might bring some witness in to say, I had sex with her the night before or two days before, a week before. That’s not admissible.”
¶ 177. As with all evidentiary rulings, a trial court’s denial of a motion in limine regarding a Rule 412 motion is reviewed under an abuse-of-discretion standard. McDowell v. State, 807 So.2d 413, 421 (Miss.2001). The purpose of Rule 412 is “to prevent the introduction of irrelevant evidence of the victim’s past sexual behavior to confuse and inflame the jury into trying the victim rather than the defendant.” Hughes v. State, 735 So.2d 238, 273 (Miss.1999).
¶ 178. Prior to the court’s ruling, the following exchange occurred with regard to the State’s Rule 412 motion:
DEFENSE: Your Honor, we have no objection other than to the prior sexual encounters she may have had with the defendant. They had had sex pri- or to this time. I think the facts will show that.
THE COURT: What about that, Mr. Huffman?
PROSECUTOR: Your Honor, I think if he’s going to testify to that, then I think that would be permitted by the rules.
THE COURT: Yeah, I think it is too. So I’m going to grant the motion in limine to the extent that it applies to other witnesses, but if the defendant takes the stand and testifies—
DEFENSE: Your Honor, I meant other than that, if in fact because consent is part of the defense here. And if witnesses can testify that they know that he had went with her, went places with her and they were in such a position or place that they might have engaged in some sexual activity, then I think we’re entitled to have that information brought out and given to the jury, not that anybody else can say — I don’t think anybody else can say they saw them.
THE COURT: That’s what I was going to say. That sounds pretty speculative or conjectural.
DEFENSE: I know, Your Honor, and-but I think if we were at that point, the [S]tate would object to it and say, he’s trying to show that they were lovers or something. And I think we have a right to do that.
THE COURT: Well, I’m going to grant the motion at this time, Mr. Rishel. But if we come to a point in the trial where there is a witness that you think might bring out this testimony and it would be admissible, we’ll dismiss the jury and have a proffer or have a hearing on the matter.
¶ 179. Based on our review of the record, despite the trial court’s conditional offer, Galloway made no attempt to introduce any such witness(es) at trial. Accordingly, this issue is without merit.
21. The trial court committed reversible error by denying the defendant’s motion to suppress evidence.
¶ 180. Galloway contends the trial court erred in denying his motion to suppress evidence collected from his mother’s Ford Taurus. He claims (1) Carbine did not have probable cause to conduct a warrant-less search of the vehicle; (2) the invento *669 ry search of the vehicle immediately after Galloway’s arrest was illegal; and (3) Galloway’s arrest was a pretext for searching and seizing his mother’s vehicle.
¶ 181. This issue is without merit. “In reviewing the denial of a motion to suppress, we must determine whether the trial court’s findings, considering the totality of the circumstances, are supported by substantial credible evidence.” Gore v. State, 37 So.3d 1178, 1187 (Miss.2010) (quoting Moore v. State, 933 So.2d 910, 914 (Miss.2006)). Review of the record is not limited to evidence presented to the trial judge at the suppression hearing; this Court may look to the entire record to determine whether the trial judge’s findings are supported by substantial evidence. Holland v. State, 587 So.2d 848, 855 (Miss.1991); see also Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 285-86, 69 L.Ed. 543 (1925).
¶ 182. Individuals are protected under both the United States Constitution and the Mississippi Constitution from unreasonable searches and seizures. U.S. Const. amend. IV; Miss. Const. art. 3, § 23; see also Graves v. State, 708 So.2d 858, 861 (Miss.1997) (noting that Mississippi’s Constitution provides greater protection from unreasonable search and seizure than the U.S. Constitution). As a general rule, our state and federal Constitutions prohibit searches without a valid warrant unless an exception applies. Eaddy v. State, 63 So.3d 1209, 1213 (Miss.2011). Such exceptions include “a consensual search, a search incident to arrest, an inventory search, a search under exigent circumstances if probable cause exists, and a search of a vehicle when making a lawful contemporaneous arrest.” Bradley v. State, 934 So.2d 1018, 1022 (Miss.Ct.App. 2005) (citing Graves v. State, 708 So.2d 858, 862-63 (Miss.1998)). The State bears the burden to show that a warrantless search comes within an exception for evidence seized thereupon to be admissible. Jackson v. State, 418 So.2d 827, 829 (Miss.1982).
¶ 183. Here, the trial court denied Galloway’s suppression motion after finding that Galloway’s vehicle was stopped lawfully and Carbine had probable cause to conduct a walk-around inspection of the vehicle. The record supports the trial court’s findings.
¶ 184. Carbine testified that, immediately upon inspecting Anderson’s body and the crime scene, they began “looking for a vehicle as a murder weapon.” Carbine determined that the victim was last seen leaving her grandmother’s house in a white Ford Taurus with a light skinned black male called “Bo” from the Moss Point area. The investigation identified two individuals who went by the nickname “Bo,” who lived in Moss Point and drove a white Ford Taurus. One of the individuals was Galloway, who investigators determined possibly resided at 6425 Shortcut Road. On December 9, 2008, Carbine drove by the residence, viewed the vehicle’s license plate number, and learned that the vehicle was registered to Galloway’s mother, Ollie Varghese. McClenic also drove by the residence and observed a white Ford Taurus in the driveway. Through his investigation, McClenic learned that Galloway had an outstanding arrest warrant for a misdemeanor and a suspended driver’s license. McClenic and his deputies “began running constant surveillance on 6425 Shortcut Road.” After about an hour and a half of surveillance, at approximately 10:00 p.m. on December 9, the white Ford Taurus reportedly left the residence. Authorities stopped the vehicle a short distance away and arrested Galloway on the outstanding warrant. Galloway’s friend Triplett also was in the vehicle when it was stopped. When Carbine arrived at the *670 scene, Galloway was standing by the driver’s side door in handcuffs, and officers were conducting an inventory search of the vehicle in preparation for having it towed. Carbine walked around the vehicle and performed a visual inspection. She noticed underneath the vehicle “something hanging, kind of flapping in the wind.” Because the vehicle was going to be towed, Carbine removed and secured the substance, which later was determined to be Anderson’s skin. The vehicle was towed and secured at Bob’s Garage. Two different search warrants for the vehicle were obtained and executed, neither of which Galloway challenged on legality at trial; nor does he do so on appeal.
¶ 185. On appeal, Galloway and the State both provide this Court a thorough discussion with regard to warrantless searches and seizures under Fourth Amendment law and state constitutional law. But we need not respond in kind because it is plain from the record that there was no violation of either.
¶ 186. This record before us abounds with evidence justifying a finding of probable cause and exigent circumstances. See Deeds v. State, 27 So.3d 1135, 1144 (Miss.2009) (warrantless searches are permissible in exigent circumstances if shown that grounds existed to conduct the search that, had time permitted, reasonably would have satisfied a disinterested magistrate that a warrant properly should issue). The investigation in this matter rapidly came together on December 9. That was when investigators spoke to the victim’s family-Brimage in particular, who described the person with whom Anderson had left and the white Ford Taurus in which they had driven away. Brimage was certain it was a Ford Taurus because her school district uses these type vehicles. As a result of Carbine’s and McClenic’s ensuing investigative efforts, Galloway became a suspect. Investigators determined his possible location and there observed a parked white Ford Taurus fitting Brimage’s description. Based on the underlying facts and circumstances attending the case, the vehicle itself was believed to be evidence in a crime. And sufficient probable cause existed at that point to obtain a search warrant. Whether authorities were in the process of obtaining one, the record does not disclose. No matter, because the record illustrates that Jackson County authorities, armed with a valid arrest warrant, lawfully stopped the white Ford Taurus shortly after it left its location, en route to who knows where. Through prudent police work, Carbine thereafter obtained a piece of evidence from the vehicle’s undercarriage prior to the vehicle being towed.
¶ 187. For these reasons, we find the trial court correctly overruled Galloway’s suppression motion. This issue is merit-less.
22. The trial court violated Galloway’s rights in allowing victim-impact evidence in the guilt-innocence phase over defense objections.
¶ 188. Galloway contends the prosecution introduced improper and highly prejudicial victim-impact evidence during the guilt/innocence phase of trial through its first witness, Graham, the victim’s uncle. Galloway contends this evidence bore no relevance to the issue of Galloway’s guilt and served only to inflame the jury.
¶ 189. During Graham’s testimony, he described Anderson as “beautiful, healthy, fun loving. She had dark eyebrows. She was like what we might call light skinned with a tan.” Graham called her “Ching” because she looked Asian when she was a baby. He told the jury Anderson was “the baby,” the youngest of four siblings. He *671 testified that Anderson was “a senior in high school” and that she was “all excited about graduating and joining the Air Force. She had been in the ROTC.” The State asked Graham if other family members were in the Air Force, and Graham responded, “Yeah, her older brother Jerry is still in the Air Force, and one of her sisters, Janice, was in the Air Force.” The defense entered an objection at that point on the ground of “relevancy,” which the trial court overruled.
¶ 190. On appeal, Galloway acknowledges that the State called Graham because he was present at the grandmother’s house with Anderson on the night she disappeared. But he contends Graham’s testimony far exceeded his account of the circumstances that night and instead focused on Anderson’s physical appearance, the family members that she left behind, and the promising future that was taken from her.
¶ 191. “Victim impact statements are those which describe the victim’s personal characteristics, the emotional effect of the crimes on the victim’s family, and the family’s opinion of the crimes and the defendant.” Wells v. State, 698 So.2d 497, 512 (Miss.1997) (citing Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)). In Hansen v. State, 592 So.2d 114, 146-47 (Miss.1991), this Court adopted the United States Supreme Court’s holding in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991),. that the Eighth Amendment does not bar victim-impact evidence during the penalty phase at trial.
¶ 192. This Court points out that, in reaching its holding, the Payne Court noted that various pieces of evidence regarding the victim’s background likely would have been presented during the guilt phase of the trial. Id. at 823. Accordingly, the Court concluded that it would be anomalous to require strict exclusion of such evidence at the sentencing phase because the jury already would have heard that evidence at the guilt phase. Id. at 840-41. Thus, Payne suggests that limited victim-background evidence may be admitted — indeed, may have to be admitted — during the guilt phase of trial.
¶ 193. In Goff v. State, 14 So.3d 625, 652 (Miss.2009), we found testimony provided by the State’s witness, who identified himself as the victim’s “husband of eight years, who reiterated they had two children together, and stated where the [the victim] worked,” did not constitute victim-impact evidence. Rather, it “ ‘concerned the background of the victim’ and merely set the stage for the presentation of relevant evidence.” Id. (quoting Spicer v. State, 921 So.2d 292, 307 (Miss.2006)). In Spicer, this Court found that testimony “concerning the background and habitual actions of the victim was not ‘victim impact’ testimony, but instead was admissible to explain the circumstances surrounding the crime and establish guilt.” Spicer v. State, 921 So.2d at 307 (quoting Scott v. State, 878 So.2d 933, 963-64 (Miss.2004), overruled on other grounds by Lynch v. State, 951 So.2d 549 (Miss.2007)). In Scott, the victim’s wife testified that she and her husband had been married almost fifty-two years, hunted and fished together, and both were enjoying retirement. Scott v. State, 878 So.2d at 963. This Court found the wife’s testimony was not victim-impact testimony. Id. at 964.
¶ 194. Here, Graham was the State’s first witness. He merely provided some background information concerning Anderson. Graham did not state any emotional effect the crime had on him or his family, nor did he state an opinion of the defendant. In our opinion, however, the trial court erred in not sustaining Galloway’s objection to Graham’s statement re *672 garding Anderson’s siblings, as such information was irrelevant. Nevertheless, we find the error harmless beyond a reasonable doubt.
23. Galloway was denied effective assistance of counsel.
¶ 195. Galloway contends the totality of trial counsel’s errors, including those noted in issues 4, 8, 9, 10, 14, 15, 16, 17, 19, 20, 21, 22, and 24 (incorporated here), and those described below, violated his right to effective assistance of counsel.
¶ 196. As previously discussed, we apply the two-pronged test set forth in Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. 2052, for ineffective-assistance-of-counsel claims. Galloway must show that his counsel’s performance was deficient, and that counsel’s alleged deficiency prejudiced his defense to such extent there is a reasonable probability the result of the proceeding would have been different. Id. at 694, 104 S.Ct. 2052. Because we are limited to the trial record on direct appeal, we will address an ineffectiveness claim only if the presented issues are based on facts fully apparent from the record. M.R.A.P. 22.
¶ 197. The ineffectiveness claim under issue 4 already has been addressed. We find the ineffectiveness claims made under previously discussed issues 8, 9, 10, 14, 15, 16, 19, 20, 21, and 22 are based on facts fully apparent from the record. Having considered the claims associated therewith, we find that Galloway has failed to show prejudice sufficient to satisfy the second Strickland prong. With regard to issue 17, dealing with Brimage’s in-court identification of Galloway, Galloway claims defense counsel failed to ask for a ruling on a pretrial motion to suppress any show-up identifications of Galloway. This cannot be addressed based on the record before us. Galloway may argue this claim through a petition for post-conviction relief. Galloway’s ineffectiveness claim with regard to issue 24 will be addressed under that issue.
¶ 198. We will now speak to Galloway’s other ineffectiveness claims.
A. Voir Dire Ineffectiveness
¶ 199. Galloway alleges that trial counsel was ineffective for failing to challenge potential juror McCoy for cause. He contends McCoy should have been challenged because he initially indicated that he automatically would impose the death penalty for capital murder. This contention is without merit. McCoy was not chosen as a juror or an alternate juror. And the record shows that after additional individual voir dire, McCoy explained that he had misunderstood the question and changed his answer by indicating he would be fair and consider all possible punishment that could be imposed.
¶ 200. Galloway next contends that Juror Smith should have been challenged because she indicated that she would have very strong feelings and would impose the death penalty for any crime involving sexual assault. This contention is without merit because, like McCoy, Smith was not chosen as a juror or an alternate juror.
B. Pretrial Ineffectiveness
¶ 201. Galloway contends that defense counsel failed to request a ruling on a motion to suppress Galloway’s police statement challenging his waiver of his Miranda [6] rights as not knowing, voluntary, or intelligent. This contention cannot be addressed based on the record before us. Therefore, Galloway may argue the claim through a petition for post-conviction relief.
¶ 202. Galloway contends another pretrial failure occurred when defense *673 counsel sought an order for funds from the trial court for Dr. Riddick’s assistance while in the State’s presence, thereby failing to take advantage of this Court’s clear law from Manning v. State, 726 So.2d 1152 (Miss.1998), which says “the State has no role to play in the determination of the defendant’s use of experts.” Galloway submits the necessity and propriety of such assistance is a matter left entirely to the discretion of the trial court. The State argues that Manning cuts both ways. In Manning, the defendant claimed that the trial court erred by requiring the defense to give notice to the prosecution of his intent to seek a mental-competency exam. Id. Since the motion for a competency exam was filed prior to the trial court’s instruction, the Court held the issue was meritless. The Manning Court then commented that “the State has no role to play in the determination of the defendant’s use of experts. The necessity and propriety of assistance is a matter left entirely to the discretion of the trial court.” Id.
¶ 203. We agree with the State. Manning did not find the trial court erred by requiring the defense to provide notice regarding the possible retention of an expert. Nor does Manning stand for the proposition that trial counsel was ineffective by requesting an expert on the record in the prosecution’s presence. The case, rather, reiterates that the determination of a defendant’s use of experts is left to the discretion of the trial court.
¶ 204. As this Court noted in McGilberry v. State, 741 So.2d 894, 916 (Miss.1999), the federal courts have held that hearings concerning an indigent’s need for expert assistance and the services of an investigator must be held ex parte. But “[a]ll involve the interpretation of 18 U.S.C. § 3006A(e).” Id (citation omitted). Mississippi “has not seen fit to adopt this requirement either by statute or court rule.” Id.
¶ 205. Accordingly, this claim fails under both Strickland prongs. There being no per se requirement in this State that Galloway’s request for expert assistance be made ex parte, defense counsel cannot be deemed to be deficient by failing to pursue an ex parte motion or ruling from the trial court. Moreover, Galloway has failed to demonstrate how this was prejudicial to the assurance of a fair trial.

C. Penalty-Phase Ineffectiveness

¶ 206. Defense counsel promised the jury in its opening statement at the penalty phase that the jury would hear from Dr. Beverly Smallwood, a psychologist who had met with Galloway and had performed testing on him. But defense counsel failed to call Dr. Smallwood.
¶ 207. We cannot address this claim based on the record before us. Therefore, Galloway will be allowed to raise it in a post-conviction proceeding.
¶ 208. Galloway also contends that defense counsel was ineffective for failing to object to the trial court’s sentencing instruction defining mitigation evidence as “any matter or aspect of the defendant’s character or record and any other circumstance of the offense brought to you during the trial of this case which you, the jury, deem mitigation of behalf of the defendant.” This argument was addressed in issue eleven. This language was part of jury instruction S-100A, the “long-form instruction.” As mentioned, this instruction was approved by this Court in Branch, 882 So.2d at 69. Thus, there was no basis to object to it.
24. The evidence introduced by the State in support of the aggravating circumstance of a prior conviction for a crime of violence was constitutionally insufficient.
¶ 209. During the penalty phase, the State submitted a certified “pen *674 pack”[7] as evidence that Galloway had a prior felony conviction involving the use or threat of violence and that Galloway was under a sentence of imprisonment at the time he murdered Anderson. The “pen pack” contained (1) certification of records form; (2) sentence computation record; (3) social-admission interview; (4) release document; (5) order; (6) commitment papers; (7) indictment; (8) fingerprint card; and (9) photograph.
¶ 210. In Russell v. State, 670 So.2d 816, 831 (Miss.1995), this Court held that a “pen pack,” containing essentially the same kind of documents here, submitted as evidence during the penalty phase of a capital-murder case, was relevant under Section 99 — 19—101 (5)(b) to prove beyond a reasonable doubt the two statutory aggravates charged in that case.[8] See also Duplantis v. State, 708 So.2d 1327, 1346 (Miss.1998) (“Certified copies of indictments and sentencing orders are sufficient to prove prior criminal convictions for habitual offender sentencing.”).
¶ 211. Likewise, we find the “pen pack” submitted in this case sufficiently established that Galloway had a prior felony conviction involving the use or threat of violence to the person and was under sentence of imprisonment. This issue is without merit.
25. The “especially heinous, atrocious, or cruel” aggravating circumstance was constitutionally invalid.
¶ 212. Galloway argues that the trial court’s sentencing instruction on the “especially heinous, atrocious, or cruel” ag-gravator was unconstitutionally vague and overbroad. The instruction provided as follows:
The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious, or cruel: heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel mean[s] designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of Capital Murders, the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death .was suffered by the victim then you may find this aggravating circumstance.
¶ 213. The exact language of this instruction has been found to be legally sufficient so as to satisfy constitutional requirements recognized in previous decisions by this Court. See Bennett, 933 So.2d at 955-56; Havard v. State, 928 So.2d at 799-800 (Miss.2006); Knox, 805 So.2d at 533; Stevens v. State, 806 So.2d 1031, 1060 (Miss.2001). Thus, this contention is without merit.
*675 ¶ 214. Galloway also contends that the prosecution failed to adduce sufficient evidence to convince a reasonable juror beyond a reasonable doubt the method of killing utilized caused the victim “physical pain,” or “mental pain,” “mental torture and aggravation,” “serious mutilation,” or “dismemberment of the body,” “a lingering death,” or “a tortuous death.” Galloway further contends that the jury’s contrary finding was against the overwhelming weight of the evidence.
¶ 215. Dr. McGarry testified at length regarding the condition of Anderson’s body both at the crime scene and upon autopsy. When Dr. McGarry arrived at the crime scene he found the body “lying on a dirt road, twisted and distorted, smeared with blood and dirt, with parts of her body gouged out.” Where Anderson’s body lay, there was “evidence of tire tracks in a turning pattern around her and over her body at least three places.” Dr. McGarry “found teeth and pieces of bone and flesh ten feet from her body.” In examining Anderson at that location, Dr. McGarry found evidence of her body “having been rolled over and crushed, distorted, mangled. She had a swollen face. She had injuries of her hands and face that preceded the rollover.”
¶ 216. From his autopsy report, Dr. McGarry related that he found evidence of defensive wounds on Anderson. He explained:
Defensive wounds are those injuries that occur on a person who is being attacked by another person who holds up arms, holds up hands, holds hands over face, pulls up knees, shins and attempts to ward off injuries being inflicted by another person. The injuries are on these parts of the body, the backs of the forearms and hands, the knees, the shins and the shoulders and hips. And when I see that pattern I call those defensive injuries. They are injuries inflicted when she is attempting to defend herself against an attacker.
¶ 217. Dr. McGarry stated that Anderson had three cuts on the skin of her neck, two close together, two inches long, along the left side, and one around the right side that came across the midline. He said, “These were not part of her general injuries. These were throat cutting type of injuries, three in a row by some kind of sharp object. It did not go all the way through the skin.” When asked by the prosecution if these cuttings caused Anderson’s death, Dr. McGarry replied, “No.”
¶ 218. Dr. McGarry described the burns found on Anderson’s body and opined what caused them:
This [is] what I would call a flash burn, the kind of burn that occurs when something is put on the body, like throwing some kind of flammable substance on the body, and it burns all of a sudden. It burned most of her hair, eyebrows, eyelashes, and then it went over her body in sort of a splash pattern. Didn’t get all of the skin, but it had large linear line like area of burns that would occur if she were splashed with something and then ignited.
[[Image here]]
[T]his would be a massive surface burn. It would not be instantly fatal. It would be a million times worse than touching a hot flame with a part of the body. It’s widespread and almost generalized. It would be extremely painful, but it would not be lethal at the moment. A person with this kind of burn ordinarily would live a few days and be treated.
When asked by the prosecution if a human would be able to retreat with this type of burn, Dr. McGarry replied: “This would be so painful that it would be a paralyzing *676 type of pain, kind of pain that makes a person collapse and be helpless.”
¶ 219. Dr. McGarry’s examination also revealed that Anderson suffered a fractured breast bone, broken ribs in front and back, and her “chest was crushed in a band of injury across the heart and lung.” Her lungs, liver, and spleen were ruptured. She had tears of both kidneys, and both sides of the front of her pelvis were fractured.
¶ 220. Dr. McGarry determined that Anderson had died from “crushing injuries causing punctures of the lungs, rupture of internal organs, internal bleeding, inability to breathe.” And he testified that the type of injuries Anderson received were consistent with being set on fire and run over by a vehicle.
¶ 221. The evidence more than sufficiently supports the jury’s finding that Anderson’s death was heinous, atrocious, and cruel. And there is nothing about this evidence that preponderates so heavily against this jury’s finding on this aggravator that would sanction an unconscionable injustice by allowing it to stand.
¶ 222. Reasonable minds rationally could conclude from these facts that Galloway inflicted physical and mental pain upon Anderson prior to her death, as evinced by the defensive wounds discovered on her body. Reasonable minds also could conclude that Anderson suffered a torturous death by being set afire before being crushed to death by Galloway’s vehicle. A burn location was some feet from the clearing where Anderson’s body was found, and Dr. McGarry and Carbine observed a drag pattern from that location to the spot where Anderson’s body was found among tire tracks. Since Dr. McGarry determined Anderson’s cause of death was her being crushed by an automobile, and her body was found surrounded by tire tracks, one could reasonably infer from these facts that Anderson was burned while still alive and dragged to the logging road where Galloway ran his vehicle over her. And then there is the actual method of killing Galloway utilized, repeatedly rolling over Anderson with his vehicle, which crushed the life out of her and left her body in a “mutilated” state.
¶ 223. There is no merit in this issue.
26. By requiring prospective jurors to swear prior to voir dire that they would render “true verdicts ... according to the law and evidence,” and commit that they will “follow the law,” the trial court created a constitutionally intolerable risk that Leslie Galloway was unable to vindicate his constitutional right to determine whether the prospective jurors in his case could be fair and impartial and follow the law.
¶ 224. Prior to voir dire, the trial court administered the petit juror oath, pursuant to Mississippi Code Section 13-5-71, requiring the prospective jurors to swear that they “will well and truly try all issues and execute all writs of inquiry that may be submitted to you by the Court during the present week and true verdicts according to the law and the evidence so help you God?” Miss.Code Ann. § 13-5-71 (Rev. 2002). Then, before general voir dire questioning by the parties, the judge asked the jurors to “commit to me now ... even though you don’t know what the law will be until I give it to you, do you commit to me that you will follow the law that I give you at the end of the case?” After the jury was selected, the trial court administered the capital juror oath pursuant to Section 13-5-73.
¶ 225. Galloway argues that administration of the petit juror oath and *677 requiring jurors to commit to following the law prior to voir dire created a constitutionally intolerable risk that his defense was unable to determine whether prospective jurors could be fair and impartial and follow the dictates of the law. Galloway contends that jurors who have sworn that they will render such verdicts and have committed to doing so will be far less willing to admit during voir dire that they are unable to do so, because to admit that they are unable to do so would be to admit in effect that they had sworn falsely. For support of his argument, Galloway relies on Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), — a decision which in no way supports Galloway’s argument.
¶ 226. Indeed, Morgan acclaims juror oaths.
¶ 227. As recognized by the Fifth Circuit, Morgan “involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant.” United States v. Greer, 968 F.2d 483, 437 n. 7 (5th Cir.1992). Morgan held that a capital defendant “must be permitted on voir dire to ascertain whether his prospective jurors” would “impose death regardless of the facts and circumstances of conviction.” Id. at 735-36, 112 S.Ct. 2222. Morgan explained that due process demands that, “if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment’s holding.” Id. at 727, 112 S.Ct. 2222. In capital cases, a juror is constitutionally unqualified if he has “views on capital punishment” that would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” Id. at 728, 112 S.Ct. 2222 (emphasis added). “[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause.” Id. at 728, 112 S.Ct. 2222 (emphasis added). Likewise, “[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do [,]” and must also be removed for cause. Id. at 729, 112 S.Ct. 2222 (emphasis added).
¶ 228. Morgan rejected Illinois’ argument that “general fairness questions and ‘follow the law’ questions ... are enough to detect those in the venire who automatically would vote for the death penalty.” Id. at 735, 112 S.Ct. 2222. Morgan said “such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed.” Id. at 735, 112 S.Ct. 2222. “More importantly, however, the belief that death should be imposed ipso facto upon conviction of a capital offense reflects directly on that individual’s inability to follow the law.” Id. (emphasis added). The Morgan Court added, “It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so.” Id. (emphasis added). Thus, “[a] defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.” Id. at 735-36, 112 S.Ct. 2222.
¶ 229. Here, the record shows that, after the petit juror oath was administered and before voir dire examination began, the trial court informed the venire this was a capital case, where the death penalty is a possible punishment. The court explained *678 the case would be tried in two stages; that during the second stage, the jury-after hearing, considering, and weighing the evidence of aggravating and mitigating circumstances-would retire to consider the sentence to be imposed; and that only two sentences could be considered-death or life imprisonment without parole. The trial court then emphasized that the death penalty cannot automatically be imposed for this crime and stated that “the jury should not consider any sentence until after hearing all the evidence, receiving instructions, and hearing arguments at the conclusion of the second stage of this trial.”
¶ 230. Afterward the trial court queried the venire, as follows:
Should this case require by your verdict a second phase or penalty phase, I must now inquire as to your thoughts or beliefs as to the imposition of the death penalty. Do any of you have conscientious scruple[s] against the infliction of the death penalty when the law authorizes it in the proper case and where the testimony and the evidence warrants it? Does anybody have conscientious scruples against awarding the death penalty? All right.
All right. This is a follow-up question. Could or would your attitude toward the death penalty prevent you or materially affect you in making the decision as to the defendant’s guilt? In other words, if you have conscientious scruples against the death penalty, would that affect your ability to impartially decide the guilt phase of the case?
All right. Let me ask you this question, if you do have conscientious scruples against awarding the death penalty, ... [wjould you automatically vote against the imposition of the death penalty without regard to the evidence that might be developed in the trial of this case ... ? In other words, would you vote against the death penalty without regard to the evidence that is brought forth during the course of the trial? All right.
All right. The next question is would you automatically vote for the imposition of the death penalty without regard for the evidence of aggravation or mitigation and only for the reason that you may find the accused guilty of the crime of capital murder? In other words, do you hold the belief that if he was to be found guilty of the crime of capital murder that you would vote for the imposition of the death penalty regardless of the evidence?
¶ 231. The record illustrates that eleven venire members indicated that they could under no circumstances impose the death penalty, and ten members indicated that they would automatically impose the death penalty. The record shows that, upon further examination by the trial court and attorneys from both sides, of the eleven who initially indicated that they absolutely opposed the death penalty, one later withdrew his original response and stated that he could find circumstances where the death penalty was appropriate. Of the ten who stated they automatically would impose the death penalty, four revised their initial responses and stated they would not indiscriminately impose the death penalty. They told the court they would consider the aggravating and mitigating circumstances and could make a determination whether life in prison without parole should be imposed.
¶ 232. The record before us belies Galloway’s notion. And we find his argument meritless.
27. The trial court erred by limiting nonelector jurors to “resident freeholders for more than one year.”
¶ 233. Galloway next contends that the trial court erred by limiting the *679 venire to qualified electors of Harrison County or resident freeholders for more than one year. But Galloway failed to raise a contemporaneous objection to this criteria and thus is procedurally barred from asserting the claim on appeal. Williams v. State, 684 So.2d 1179, 1203 (Miss.1996). Procedural bar notwithstanding, Galloway’s claim is meritless. This same claim was asserted in Jordan v. State, 786 So.2d 987 (Miss.2001), and it was rejected. Jordan found the issue meritless, noting that the Legislature “added the qualifier of freeholder for the very reason that jury members would not be limited to registered voters, Brown v. State, 240 So.2d 291, 292 (Miss.1970), thereby expanding the list of qualified ve-nire.” Jordan, 786 So.2d at 1024.
28. Mississippi’s capital-punishment scheme is unconstitutional on its face and as applied.
¶234. Galloway claims there are six reasons why Mississippi’s capital-punishment scheme is unconstitutional on its face and as applied to him. First, Galloway contends that the jury made no specific-intent finding, and it is constitutionally impermissible to execute a defendant without a finding of specific intent to commit a crime. Second, Galloway submits that, by treating the nature of his mens rea as a threshold aggravating issue, Mississippi’s capital-punishment statute put beyond the effective reach of the sentencing jury the mitigating fact that Galloway did not kill, attempt to kill, or intend that a killing take place, which violated the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Mississippi Constitution. Third, under Mississippi’s capital-punishment scheme, persons such as Galloway convicted of murder simpliciter automatically are guilty of capital murder and eligible for the death penalty, but persons convicted of killing a human being with “deliberate design,” or by committing “an act eminently dangerous to others and evincing a depraved heart” are guilty only of simple murder and are ineligible for the death penalty. Fourth, the sexual battery in this case was used both to make the murder death-eligible and as a means of narrowing the class of murders. Fifth, the death sentence in this case is wanton, freakish, excessive, and disproportionate. And sixth, the death penalty in Mississippi has been and is being imposed discrimina-torily against defendants convicted of killing whites, against defendants convicted of killing white women, against males, and against poor people.
¶ 235. For his first contention, Galloway’s cites Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), in which the Supreme Court held that it was unconstitutional to execute a criminal defendant without the jury finding specifically that the defendant actually had killed, attempted to kill, intended to kill, or contemplated that lethal force would be employed. This Court has interpreted Enmund to hold that “the factors are read in the disjunctive, so that it is sufficient and necessary that the jury find one Enmund factor before a defendant can be sentenced to death.” Jordan v. State, 786 So.2d 987, 1029 (Miss.2001) (citing Holland, 705 So.2d at 327). All that is constitutionally required is that the jury find, as they did here, that Galloway actually killed, regardless of intent. Id. This point of contention is without merit.
¶ 236. Galloway’s second contention is a rehashing of the first and likewise is without merit.
¶ 237. As to Galloway’s third and fourth contentions, he claims that Mississippi’s capital-punishment scheme, as applied to felony murders, violates the *680 Eighth and Fourteenth Amendments because it does not furnish a principled means of distinguishing defendants who receive the death penalty. He argues there is no rational or historical basis for treating felony murderers as more culpable than premeditated murderers for purposes of capital punishment. Further, the sexual battery in this case was used both to make the murder death-eligible and as a means of narrowing the class members.
¶ 288. As this Court has held:
Our precedents make clear that a State’s capital sentencing scheme must ... genuinely narrow the class of defendants eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sen-tencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.
Blue v. State, 674 So.2d 1184, 1216 (Miss.1996) (quoting Arave v. Creech, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993)). Not every defendant eligible for the death penalty will have committed murder while in the course of sexual battery or the other statutorily enumerated felonies. See Miss.Code Ann. § 97-3-19 (Rev.2006). Therefore, the felony-murder aggravator genuinely narrows the class of defendants eligible for the death penalty. Further, “[t]he legislature has a very great latitude in prescribing and fixing punishment for crime.” Thorson v. State, 895 So.2d 85, 106 (Miss.2004) (quoting Wilcher, 697 So.2d at 1109). Use of the underlying felony as an aggravating factor during sentencing has been upheld consistently by this Court in capital cases. Wilcher, 697 So.2d at 1108.
The argument is the familiar “stacking” argument that the state can elevate murder to felony murder and then, using the same circumstances can elevate the crime to capital murder with two aggravating circumstances. As pointed out in Lockett v. State, 517 So.2d 1317, 1337 (Miss.1987), this Court has consistently rejected this argument.
Id. (quoting Walker v. State, 671 So.2d 581, 612 (Miss.1995)). The United States Supreme Court has held that this practice does not render a death sentence unconstitutional. See Lowenfield v. Phelps, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (fact that aggravating circumstance duplicated one of the elements of the crime does not make a death sentence constitutionally infirm).
¶ 239. Galloway next argues that the offense for which he was convicted was, though tragic, simply not within that “narrow category of the most serious crimes” that the Eighth Amendment contemplates punishing with the ultimate penalty. We find that it is, for reasons already discussed.
¶ 240. Lastly, Galloway claims Mississippi’s death-penalty scheme is applied in a discriminatory and irrational manner in violation of the of the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment and corresponding clauses of the Mississippi Constitution. The United States Supreme Court rejected an almost identical argument in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). There, Warren McCleskey argued that Georgia’s capital-punishment statute violated equal protection, based upon a study showing that black defendants were more likely to be sentenced to death than white defendants, and defendants murdering *681 whites were more likely to be sentenced to death than defendants who murdered blacks. Id. at 291-92,107 S.Ct. 1756. The Court held that, in order to raise a successful claim of an equal-protection violation, the criminal defendant must prove that “the decision makers in his case acted with discriminatory purpose.” Id. at 292, 107 S.Ct. 1756. McCleskey’s only proof supporting his claim was the results of the study. The Court determined that, due to the number of variables inherent in capital sentencing and the discretion allowed trial courts in implementing criminal justice, the use of statistical evidence was insufficient to prove purposeful discrimination. Id. at 292-97, 107 S.Ct. 1756.
¶ 241. Likewise, Galloway offers no proof that the death penalty is applied in a discriminatory manner in Mississippi, or that he suffered discriminatory application of the law. His only support for this claim is insufficient statistical data, similar to that rejected by the McCleskey Court. This point of contention is without merit.
29. Prosecutor’s unfettered, stan-dardless, and unreviewable discretion violates equal protection, due process, and the Eighth Amendment.
¶ 242. Galloway contends Mississippi lacks statewide standards governing the discretion of local prosecutors to seek or decline the execution of death-eligible defendants. As a result, the decision whether to seek the death penalty turns on personal policies of the local prosecutor. Relying on reasoning from Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), Galloway claims Mississippi fails to provide even an “abstract proposition” or “starting principle” as to how local prosecutors should make these life-and-death decisions.
¶ 243. Both this Court and the Supreme Court repeatedly have rejected this type of argument. See McCleskey, 481 U.S. at 296-97,107 S.Ct. 1756 (presentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional); Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (“Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.”); Jordan v. State, 918 So.2d 636, 658-59 (Miss.2005) (there is no constitutional requirement that all equally culpable defendants receive the same punishment); Jackson v. State, 672 So.2d 468, 484 (Miss.1996) (finding the issue meritless because “the capacity of prosecutorial discretion to provide individualized justice is ‘firmly entrenched in American law ”) (quoting Ladner v. State, 584 So.2d 743, 751 (Miss.1991)).
¶ 244. As the Supreme Court in McCleskey expressed, “Discretion in the criminal justice system offers substantial benefits to the criminal defendant.” McCleskey, 481 U.S. at 311,107 S.Ct. 1756. The local prosecutor “can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case.” Id. at 312, 107 S.Ct. 1756. With that power of leniency is the power also to discriminate. Id. But “a capital punishment system that did not allow for discretionary acts of leniency ‘would be totally alien to our notions of criminal justice.’” Id. (quoting Gregg, 428 U.S. at 200 n. 50, 96 S.Ct. 2909).
¶ 245. This issue is without merit.
30. This Court should reverse due to the cumulative harm of the errors.
¶ 246. Galloway claims that the cumulative effect of the errors in his trial warrants reversal.
*682 ¶ 247. This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that independently would not require reversal. Jenkins v. State, 607 So.2d 1171, 1183-84 (Miss.1992). In capital cases, “although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial.” Woodward v. State, 533 So.2d 418, 432 (Miss.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989).
¶ 248. After conducting a thorough review of the record, the briefs, and the argument, this Court has determined that there are no individual errors, or cumulative near-errors, which require reversal of either Galloway’s conviction or his sentence.
31. Mississippi Code Section 99-19-105(3).
¶249. Pursuant to Mississippi Code Section 99-19-105(3), in addition to reviewing the merits of those issues raised by Galloway, we are required to determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury’s or judge’s finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Miss.Code Ann. § 99-19-105(3) (Rev.2007).
¶ 250. After reviewing the record in this appeal as well as the death-penalty cases listed in the appendix, we conclude that Galloway’s death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We further find that the evidence is more than sufficient to support the jury’s finding of statutory aggravating circumstances. The jury did not consider any invalid aggravating circumstances. In comparison to other factually similar cases in which a death sentence was imposed, the sentence of death in this case is neither excessive nor disproportionate.
CONCLUSION
¶ 251. For the reasons set forth above, Galloway’s arguments are without merit. We affirm Galloway’s conviction and the sentence of death imposed by the Harrison County Circuit Court.
¶ 252. CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.
WALLER, C.J., RANDOLPH, P.J., LAMAR AND COLEMAN, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY DICKINSON, P.J., AND KITCHENS, J. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J.

. The record shows that Dr. McGarry is a forensic pathologist, licensed in Mississippi and Louisiana. He has been licensed for fifty years. He is board-certified in general pathology, forensic pathology, and neuropathol-ogy. He is a professor at LSU School of Medicine. He has performed more than 13,-000 autopsies, and he has testified as an expert hundreds of times in both state and federal courts.

. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. See Box v. State, 437 So.2d 19, 22-26 (Miss.1983) (Robertson, J. specially concurring), setting forth the procedure trial courts should follow when confronted with a discovery violation. That procedure is now reflected in Rule 9.04 of the Uniform Rules of Circuit and County Court Practice.

. According to the record, such questions were posed to Dubourg by defense' counsel. Dubourg explained the cautionary procedures the lab employs to guard against contamination. Dubourg also stated that if a DNA sample did get contaminated, it could “cause the DNA to break down.”

. The Federal Bureau of Investigation’s (FBI) national DNA database is known as the Combined DNA Indexing System.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. " ‘Pen packs,’ or prison packages, 'are the records maintained on inmates sentenced to the custody of the Department of Corrections.' ” Edwards v. State, 75 So.3d 73, 75 n. 1 (Miss.Ct.App.2011) (quoting Jasper v. State, 858 So.2d 149, 152 (Miss.Ct.App.2003)).

. In Russell, the defendant had previous convictions for armed robbery, escape, and kidnapping, and he was under a sentence of imprisonment when he committed the capital offense at issue -in that case. Russell, 670 So.2d at 829.